STATE of Missouri, Plaintiff–
Respondent,

v.

James A. HILL, Defendant–Appellant.

No. 18546.

Missouri Court of Appeals,
Southern District,
Division One.

July 29, 1994.

Motion for Rehearing or Transfer
Denied Aug. 22, 1994.

Application to Transfer Denied
Oct. 25, 1994.

**70**

Susan L. Hogan, Appellate Defender, Kansas City, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Michael J. Spillane, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SHRUM, Judge.

James A. Hill (Defendant) was found guilty, following a jury trial, of second degree murder. § 565.021, RSMo 1986. The trial court sentenced him to thirty years' imprisonment pursuant to the jury's assessment of punishment.

On appeal Defendant contends the evidence was insufficient to support his conviction. He also charges that the trial court erred in submitting the second degree murder verdict directing instruction and the instruction defining "proof beyond a reasonable doubt." Finally, Defendant asks that we remand to the trial court with instructions that he be allowed to file a motion for new trial based upon evidence first discovered after time for filing a new trial motion had expired.

We find the evidence sufficient and no error in the challenged jury instructions. We affirm. Defendant's request for remand is denied.

## FACTS

Tyrone Davis (the victim), was shot in the buttocks and back at the home of Denise Bernhardt and Larry Saddler in Joplin, Missouri, at approximately 1:00 a.m. on January 10, 1992. He died of massive intra-abdominal bleeding caused by the bullet that entered through his buttocks.

Saddler testified that, between 7:30 and 8:10 p.m. on January 9, 1992, he and the victim were visiting at the home of Dale Berry in Joplin when Stephen Hill, Defendant's brother, showed up. An argument between the victim and Hill soon erupted regarding money allegedly owed by Hill to the victim. The victim and Saddler left after agreeing they would meet Hill later at a Joplin restaurant and Hill would then pay what he owed. Saddler and the victim went to the restaurant as arranged, but Hill never showed up.

Saddler and the victim parted company until 12:45 a.m. January 10 when the victim called Saddler asking that he take him to a motel. Saddler declined but told the victim he could stay at his house. The victim arrived at about 1:00 a.m., and Saddler left him in the front room to "crash" on a couch. Saddler was on his way into the bathroom when he heard a knock on the front door. Saddler said he "hollered out and asked who it was." He heard somebody say "James" and people talking at the front door. He recognized Defendant's voice as one of the persons talking. He then heard voices "outside" on the porch, including someone saying, "Oh, you got a gun." Saddler then heard a single shot, and, as he came out of the bathroom, he heard a series of shots. Upon entering the front room Saddler saw the victim falling back through the door from the porch, whereupon "somebody stuck ... a foot in the door ... and was shooting through the door." Saddler slammed the door shut and heard the victim say, "They

got me." Saddler examined the victim, found the bullet wounds, and called for an ambulance and police.

Bernhardt testified that she was asleep in the bedroom she shared with Saddler when she was awakened by the sound of gunshots. She jumped out of bed and went to a bedroom door that opened to the front room. There she saw Saddler trying to close the front door and heard Saddler say, "James, what the hell are you doing?" She then saw the victim lying in her front room.

Dale Berry testified that on the evening of September 9, 1992, Saddler and the victim visited him and his girl friend, Terri Jo Gates. Sometime after they arrived, Stephen Hill arrived and got into a "loud" and "heated" argument with the victim. Berry asked them to leave, which they did, Hill going by himself and the victim and Saddler leaving together. Later in the evening, about 9:30 p.m., Defendant and his brother Stephen came to Berry's house asking about the whereabouts of the victim. They left upon learning that the victim was not at Berry's house.

Around 11:00 p.m., the Hill brothers returned to Berry's house at which time Stephen had a "nickel, chrome-plated .38 in his left hand and a .22 rifle in his right hand." Berry saw the "butt of a high-standard .22" gun inside Defendant's jacket. The Hills asked Berry "to go find them some coke," and he left with them. While with the Hills, their conduct was such that Berry believed "they were going to take me out and kill me." When the pair took Berry home at 12:55 a.m., Berry "was scared that they were going to come back and kill us." Berry then left, taking his girl friend Gates with him, "to go warn Tyrone [the victim]." Berry drove to Saddler's house, but parked and shut off his headlights when he saw Defendant on the front porch of Saddler's house talking to the victim. He also saw Stephen Hill "around the corner of Larry's house" with his "back plastered up against the wall of the house." As Defendant and the victim "were arguing," Stephen Hill "came around the corner and opened fire on [the victim]." When that happened, Defendant was on the sidewalk in front of the porch with his back to Berry.

Consequently, Berry could not see what Defendant was doing with his hands. Berry saw the victim "go down" on the porch, whereupon Berry left the area.

Gates testified that she was at her home the evening of January 9, 1992, when she heard a "very heated argument" between the victim and Stephen Hill concerning Hill's debt to the victim. She recounted another visit by Stephen Hill to her home approximately two hours later. Hill was accompanied by Defendant on his second visit. The Hills returned to her home yet another time—at 11:30 p.m.—at which time Stephen Hill was dressed in black and was carrying two guns, a short pistol and a long rifle. On their last visit, the Hills took Berry with them. When Berry returned alone about an hour later, he told Gates that he needed to go to "Larry's house and warn Tyrone [the victim]." Gates and her child went with Berry because he told her it was not safe for her to stay. When they arrived at Saddler's house, Gates saw Defendant standing in the yard facing the house, the victim on the front porch, and Stephen Hill "walking towards the front of the house." Defendant and the victim were arguing. Terri next saw Stephen Hill come around the corner of the house and raise "the guns," and she saw "flashes." When the shots ended she and Berry left, but not before seeing the Hills run from the scene of the shooting.

Defendant testified as follows. On the evening of January 9, 1992, he rode around Joplin for about an hour drinking beer until he met his brother. They drove around together until they decided to buy some drugs, prompting them to go to Berry's house sometime between 8:30 and 9:30 p.m. When they went in Berry's house, Stephen Hill had two guns, a rifle and a .32 handgun, which he intended to sell or trade for drugs. Berry had no drugs, but he left with the Hills to help them look for drugs and a buyer for the guns. After failing in those quests, Berry was taken back to his house. Through a telephone call, Defendant learned that Saddler had drugs to sell. The Hills then drove to Saddler's house, arriving sometime between 11:30 p.m. and midnight. Upon passing by Saddler's house they saw a number of

people milling around. Without ever stopping, they drove "back around" Saddler's house and then went to the home of Stephen Hill's girlfriend where they spent the rest of the night. Defendant denied shooting Tyrone Davis and denied being present when he was shot.

Patrick Dean McClintic, age 18, was called by the defense. He testified that about 1:30 a.m. on September 10, 1992, as he was preparing to go to bed, he heard three or four gunshots. The shooting prompted him to look out his window. He saw a man in front of Larry Saddler's house with his right hand pointed toward Saddler's door. The man had something in his hand, but McClintic could not identify what. As he watched, the man took off toward an alley. McClintic testified that Defendant was not the man he saw in front of, and who then ran from, Saddler's house.

The jury was instructed on first degree and second degree murder, each based on an accessorial liability theory.[1] The jury returned a guilty verdict on the second degree murder charge.

## DISCUSSION AND DECISION

*Sufficiency of the Evidence*

We deal first with Defendant's Point II, in which he challenges the sufficiency of the evidence to convict him. Specifically, he claims the evidence was insufficient for a jury to find he fired any shots at the victim, had any intent to kill the victim, or acted with Stephen Hill with the purpose of promoting or furthering the commission of second degree murder.

The standard for appellate review of the sufficiency of the evidence to support a criminal conviction is stated in *State v. Dulany*, 781 S.W.2d 52 (Mo. banc 1989):

1. Section 562.036, RSMo 1986, provides:
   "A person with the required culpable mental state is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is criminally responsible, or both."
   Under § 562.041.1, RSMo 1986, a person is criminally responsible for the conduct of another when:

"On review, the Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregards all evidence and inferences to the contrary. In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt."

*Id.* at 55[2–3]. "Credibility of witnesses and the weight and value to be given their testimony are matters within the province of the jury and are not for review on appeal." *State v. Jenkins*, 776 S.W.2d 59, 63[3] (Mo. App.1989).

In reviewing the sufficiency of the evidence when a defendant has been found guilty on an accessorial liability theory, we are guided by additional principles:

"One who, before or during the commission of a crime, intentionally and knowingly aids or encourages the commission thereof is guilty of that offense. Aiders and abettors, who act with common purpose with active participants in the crime, incur criminal liability by any form of affirmative advancement of the enterprise. The evidence need not show that defendant personally committed every element of the crime. Among other things, indicia of aiding and abetting are presence at the scene of the crime, flight therefrom and association with others involved before, during and after commission of the crime. Proof of any form of participation by defendant in the crime is enough to support a conviction and his presence at the scene, his companionship and conduct before and after the offense, are circumstances from which one's participation in the crime may be inferred."

"(2) Either before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in the planning, committing or attempting to commit the offense."

*State v. Gonzalez–Gongora,* 673 S.W.2d 811, 813 (Mo.App.1984).

■ Defendant's claim of error based on a lack of evidence that he fired shots at the victim is without merit. Because he was tried under an accessorial liability theory, the evidence did not need to show he personally committed every element of the crime. *Gonzalez–Gongora,* 673 S.W.2d at 813; *State v. Mills,* 809 S.W.2d 1, 3 (Mo.App.1990). Defendant's complaint about a lack of evidence regarding his intent to kill the victim likewise has no merit. "If an accomplice has the purpose to promote an offense, he may be found to have the required culpable state of mind for that offense." *Mills,* 809 S.W.2d at 4[4], citing *State v. Roberts,* 709 S.W.2d 857, 863 (Mo. banc), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986).

■ We are left with Defendant's claim that there was insufficient evidence to prove he acted with Stephen Hill with the purpose of promoting or furthering the commission of second degree murder. We review the evidence. Approximately three and one-half hours before the shooting, Defendant and his brother confronted Dale Berry at his home about the whereabouts of the victim. This occurred against the backdrop of an earlier "heated" and "loud" argument between the victim and Stephen Hill concerning money allegedly owed by Stephen to the victim. Defendant and Stephen Hill left after learning that the victim was not at Berry's house. Later that same evening, when Defendant and Stephen Hill returned to Berry's house, each had firearms in his possession. Berry then left with Defendant and Stephen Hill after they insisted that he do so. Because of their conduct while he was with them, Berry believed the Hill brothers were going to kill him. At 12:55 a.m., when Berry was taken back to his home, his concern about the victim's safety was such that he immediately left "to go warn Tyrone." Upon reaching Saddler's house where the victim was stay-ing, Berry and Gates saw Defendant and the victim arguing on Saddler's front porch. Initially, Stephen Hill was around the corner of the house "plastered up against the wall," but as Defendant and the victim continued to argue, Stephen Hill came around the corner of the house and opened fire on the victim. Inside the Saddler house, after learning that someone was at his front door and asking who it was, Saddler heard someone say "James." He then heard conversation and recognized Defendant's voice as one of the persons talking. He then heard someone say, "Oh, you got a gun," following which Saddler heard a single shot followed by a series of shots. As he closed the front door, Saddler exclaimed, "James, what the hell are you doing?"

This evidence supports Defendant's conviction. A rational juror could have reasonably inferred that Defendant by his conduct before the commission of the crime encouraged his brother and that he aided him in accomplishing the offense by luring the victim from Berry's front room to the front porch so that the victim could be shot by Stephen, or Defendant, or Stephen and Defendant. Point II denied.

*Alleged Instructional Error*

Having concluded there was evidence from which a properly instructed reasonable juror could have found Defendant guilty beyond a reasonable doubt, we come to the subject of Defendant's Point I: whether Instruction 7, the second degree murder verdict directing instruction, was proper. The instruction combined MAI–CR3d 313.04 (Murder in the Second Degree: Conventional) (January 1, 1987) with MAI–CR3d 304.04 (Parties: Defendant's Responsibility for Conduct of Another Person) (January 1, 1987), the latter modified according to Notes on Use 7.[2] Defendant charges reversible error because of the "disjunctive submissions of the elements"

2. Example (c) of Notes on Use 7 to MAI–CR3d 304.04 (January 1, 1987) states, in part:

"Where the evidence is not clear or conflicts as to which person (in a group including the defendant) engaged in the conduct constituting the offense (as where the defendant is charged with burglary and the evidence shows the defendant was one of the two persons, one of whom unlawfully entered the building and stole while the other remained outside as a lookout), ascribe the elements of the offense to the defendant <u>or</u> the person or other persons." (Emphasis in original.)

in Instruction No. 7, the text of which follows:

"If you do not find the defendant guilty of murder in the first degree as submitted in instruction No. 6, you must consider whether he is guilty of murder in the second degree under this instruction.

A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with him with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about January 10, 1992, in the County of Jasper, State of Missouri, the defendant or Stephen Hill caused the death of Tyrone Davis by shooting him, and

Second, that defendant or Stephen Hill was aware that his conduct was practically certain to cause the death of Tyrone Davis,

then you are instructed that the offense of murder in the second degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Third, that with the purpose of promoting or furthering the commission of that murder in the second degree, the defendant acted together with Stephen Hill in committing that offense,

then you will find the defendant guilty of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree."

Defendant contends that the disjunctive use of "defendant or Stephen Hill" in Paragraphs First and Second of Instruction 7 "lowered the state's burden of proof by permitting a finding of guilty without a finding of the essential element of intent" and "created a danger that the jury would return a verdict that was not unanimous, since some [jury members] could find [Defendant] guilty based on finding one set of facts, whereas other members of the jury could find [Defendant] guilty based on one or more other sets of facts."

Defendant challenges only Paragraphs First and Second of Instruction 7. Those two paragraphs simply hypothesize the commission of second degree murder, the corpus delicti. *See State v. Jackson*, 822 S.W.2d 952, 957 (Mo.App.1992). It is Paragraph Third, which Defendant does not attack, that requires a finding of Defendant's involvement in the commission of the offense. *See Jackson*, 822 S.W.2d at 957–58. Paragraph Third required the jury to find that Defendant, "with the purpose of promoting or furthering the commission of" the crime, "acted together with Stephen Hill in committing that offense." "A defendant who has the 'purpose' to promote the commission of a particular offense, by definition, will have the culpable mental state required by that particular offense." MAI–CR3d 304.04 (January 1, 1987), Notes on Use 5. Moreover, Paragraph Third of Instruction 7 is not a disjunctive submission. The language of that paragraph required unanimity on the ultimate conclusion that Defendant was guilty of the crime as charged. In *State v. Cox*, 820 S.W.2d 532 (Mo.App.1991), the court stated:

"Unanimity is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged, and unanimity is not required with respect to the alternative means or ways in which the crime can be committed.... [I]t is sufficient that all jurors unanimously agree on their ultimate conclusion that the defendant was guilty of the crime charged, though they may not agree on the manner in which the defendant participated in the crime if under any of the alternative ways the defendant would be guilty of the crime charged. To permit any other conclusion would be to permit the guilty defendant to escape accountability under the law because jurors could not unanimously choose beyond a reasonable doubt which of several alternate ways the defendant actually participated, even though all agree that he was, in fact, a participant."

*Id.* at 537 (quoting *Holland v. State,* 91 Wis.2d 134, 280 N.W.2d 288, 292–93 (1979), *cert. denied,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980)). Point denied.[3]

*Reasonable Doubt Definition*

■ In Point IV Defendant complains that the jury instruction on reasonable doubt, patterned after MAI–CR3d 302.04, violates federally mandated due process standards. The "firmly convinced" language of MAI–CR3d 302.04, being essentially synonymous with "beyond a reasonable doubt," is constitutional. *State v. Harris,* 870 S.W.2d 798, 811[28] (Mo. banc 1994). Point denied.

*Request For Remand*

Defendant filed a motion with this court asking that we remand this case for additional proceedings before the trial court. Specifically, he requested that we direct the trial court to hold a hearing to determine whether he is entitled to a new trial based on "newly discovered evidence."

Defendant contended in his motion and accompanying suggestions that after his trial and after the time to file a new trial motion had expired, he learned that the state had withheld "significant evidence" regarding state's witness Larry Saddler, specifically that on November 13, 1992, seventeen days after Defendant's trial, Saddler was arrested for his alleged participation in a stealing offense that occurred in Newton County, Missouri, on October 2, 1992. With his "Motion for New Trial Based on Newly Discover-

ed Evidence" filed with the trial court on December 16, 1992, Defendant included a statement drafted by an investigator for the Public Defender's Office and signed by Saddler which states, in part, "Approximately one week after his [Saddler's] incarceration, he telephoned Detective Ball at the Joplin City Police Department, and asked Detective Ball why he had been arrested in November for an alleged offense occurring in early October." Ball responded in "words to the effect of 'well, we could have come and talked to you the day you were at James Hill's trial, but we figured you had a lot on your mind.'" The trial court did not rule on Defendant's "Motion for New Trial Based on Newly Discovered Evidence," and this court denied the motion for remand.

In his third point relied on Defendant renews his remand request. He argues that information about Saddler's alleged involvement in the Newton County stealing case was "vital" and "material" evidence bearing upon the ultimate issue of his guilt or innocence because it provides evidence of Saddler's "bias, i.e., a motive for Saddler to testify for the state in hope of attaining a favorable disposition of his own criminal charges." Defendant insists that his case meets all of the requirements of newly discovered evidence, which are (a) the facts constituting the newly discovered evidence came to movant's knowledge after the end of the trial, (b) movant's lack of prior knowledge was not due to lack of diligence on his part, (c) the evidence is so material that it is

---

3. We have not ignored Defendant's case authorities, *U.S. v. Beros,* 833 F.2d 455 (3rd Cir.1987), *United States v. Gipson,* 553 F.2d 453 (5th Cir. 1977), *State v. Oswald,* 306 S.W.2d 559 (Mo. 1957), and *State v. Bell,* 854 S.W.2d 612 (Mo. 1993).

*Beros* and *Gipson* interpret Federal law, not Missouri law. Moreover, unlike here, accessorial liability was not an issue in those cases. Likewise, *Oswald* had nothing to do with accessorial liability. There, an instruction was given which allowed conviction if defendant inserted his genital organ into the mouth or rectum of the victim. The *Oswald* court found these were separate offenses and, under the instruction given, it could not be known if there was concurrence of twelve jurors on one definite charge. Thus, *Oswald* does not aid Defendant.

*Bell* is also factually dissimilar to the extent it fails to support Defendant's argument. *Bell* was

a first degree murder case where the applicable approved instruction was not given. Instead, the trial court, "on its own motion, submitted a hybrid MAI CR–3rd combination of 304.04 and 313.02." *Id.* at 614. As formatted, the instruction allowed a jury to convict with an essential finding of intent missing and created the possibility of conviction without a unanimous jury. As to the latter, the *Bell* court explained, "While we recognize accessory liability leads to the same result of a murder first degree conviction, this instruction *as submitted,* is not an acceptable vehicle to accomplish that result, particularly in a case where the state never subscribed to the accessory lability theory." *Id.* at 614 (emphasis ours). Unlike *Bell,* here, Instruction No. 7 correctly submitted to the jury the possible criminal liability of Defendant under Missouri's accessorial liability law.

likely to produce a different result at a new trial, and (d) the evidence is never cumulative nor merely of an impeaching nature. *State v. Davis,* 698 S.W.2d 600, 602[2] (Mo.App.1985).

■ Unlike the Federal Rules, our Rules do not provide a procedure or process for Missouri's trial courts or appellate courts to consider new evidence first discovered after the time for filing a motion for new trial has expired. *State v. Hamilton,* 732 S.W.2d 553, 555 (Mo.App.1987). In *State v. Greathouse,* 694 S.W.2d 903, 911[21] (Mo.App.1985), this court concluded that we were without authority to remand a case to allow a defendant to file a motion for a new trial on the ground of newly discovered evidence.

In renewing his request for remand so that the trial court can determine if he is entitled to a new trial based on newly discovered evidence, Defendant cites *State v. Mooney,* 670 S.W.2d 510 (Mo.App.1984). There the eastern district addressed an untimely request to consider newly discovered evidence as part of its "inherent power to prevent miscarriages of justice." *Id.* at 515–16. The newly discovered evidence in *Mooney* was that a child abuse victim recanted in a tape-recorded statement. The victim had a history of juvenile delinquency, had spent time in a mental hospital, was under a psychiatrist's care, and had been on medication. His mother testified that he had often lied to her.

Likewise, in *State v. Williams,* 673 S.W.2d 847 (Mo.App.1984), the eastern district remanded so that defendant could file an untimely motion for new trial based on newly discovered evidence which, if believed, completely exonerated the defendant from complicity in the crime. The court said it was "cognizant of the pervasion of justice which could occur if we were to close our eyes to the existence of the newly discovered evidence," and "in light of the State's concession that the evidence exists, it should be heard." *Williams,* 673 S.W.2d at 848.

The facts of *Williams* and *Mooney* are extremely unusual in that in both cases the defendants had newly discovered evidence that was substantive in nature and would have completely exonerated them of the crimes for which they were charged.

*Williams,* 673 S.W.2d at 847; *Mooney,* 670 S.W.2d at 512. As explained in *Davis,* 698 S.W.2d 600:

> "We note that the Supreme Court did not review our action in either *Mooney* or *Williams,* since no motion to transfer was filed. A careful reading of those cases reveals that they involved exceptional circumstances and are thus limited."

*Id.* at 603. *See McCauley v. State,* 866 S.W.2d 892, 894 (Mo.App.1993); *State v. Westcott,* 857 S.W.2d 393, 397 (Mo.App.1993); *State v. Menteer,* 845 S.W.2d 581, 587[12] (Mo.App.1992).

■ Here, as in *Davis,* the circumstances do not fall within the narrow scope of *Mooney* and *Williams.* Defendant is not asking to file an untimely new trial motion to present evidence that will exonerate him. Instead, he claims that the evidence upon which he seeks to base his motion for a new trial is of an impeaching nature, i.e., that at trial Saddler might have skewed his testimony to benefit the prosecutor and, therefore, himself. However, such evidence does not meet the fourth requirement for a new trial based on newly discovered evidence as set out in *Davis. See Menteer,* 845 S.W.2d at 587[12].

Defendant attempts to avoid the consequences of the fourth requirement of *Davis* by invoking the principles of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. He correctly says that a prosecutor has a duty not only to disclose any exculpatory evidence bearing upon his guilt or innocence but also to reveal impeachment evidence relating to a key prosecution witness. *See United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985); *Lee v. State,* 573 S.W.2d 131, 133[2] (Mo.App.1978). Continuing, he insists that the Jasper County prosecutor was under a duty to disclose that Saddler was suspected of stealing in Newton County because Defendant could then have impeached Saddler by questioning him about his possible motive to testify favorably for the state or by showing that Saddler's testimony was given in expectation of leniency. *See State v. Joiner,* 823 S.W.2d 50, 53[2] (Mo.App.1991). We disagree.

Ordinarily the credibility of a witness may not be attacked by showing his arrest and a pending charge that has not resulted in a conviction. *State v. Lockhart,* 507 S.W.2d 395, 396[1] (Mo.1974). Several exceptions to this rule exist. Among them are situations where the inquiry tends to show a possible motive for the witness to testify favorably to the state or where it shows the testimony of the state's witness was given in expectation of leniency. *Id.* at 396[3].

Despite Defendant's argument to the contrary, those exceptions do not apply here. Defendant did not allege nor did Saddler say in his signed statement that Saddler knew when he testified in this case that he was suspected of stealing in Newton County or that charges were then pending against him in Newton County. Absent a claim that Saddler knew of his Newton County problem when he testified, it is illogical to say that he was motivated thereby to testify favorably for the prosecutor or that he might perceive a possible benefit from doing so. *Cf. Joiner,* 823 S.W.2d at 53[2]. No matter how an alleged *Brady* violation is asserted, i.e., in a postconviction motion or motion to remand, the question remains whether the failure to disclose resulted in fundamental unfairness or prejudice. *State v. Smothers,* 605 S.W.2d 128, 131 (Mo. banc 1980), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1708, 68 L.Ed.2d 203 (1981). No such showing has been made here. As in *State v. Hicks,* 803 S.W.2d 143, 146 (Mo.App.1991), "Defendant has not shown the existence of any newly discovered evidence, that, but for this case being remanded to permit such additional evidence to be included in the record, would result in a miscarriage of justice." We again deny Defendant's motion for remand. Point denied.

PARRISH, C.J., and MONTGOMERY, J., concur.