STATE of Missouri, Respondent,

v.

Robert BRANSFORD, Appellant.

Robert BRANSFORD, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 18743, 20234.

Missouri Court of Appeals,
Southern District,
Division Two.

March 28, 1996.

Motion for Rehearing and Transfer
to Supreme Court
Denied April 19, 1996.

Application to Transfer Denied
May 28, 1996.

banc 1991), *cert. denied*, 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992).

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Becky Owenson Kilpatrick, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Appellant, Robert Bransford, guilty of murder in the second degree and armed criminal action. The trial court, having found Appellant a prior offender, persistent offender and class X offender, §§ 557.036, 558.016 and 558.019 RSMo Cum. Supp.1992, sentenced him to life imprisonment and thirty years' imprisonment, respectively, to run concurrently.[1] Appellant brings appeal 18743 from that judgment.

While that appeal was pending, Appellant filed a motion to vacate the judgment and sentences per Rule 29.15.[2] The motion court denied relief after an evidentiary hearing. Appellant brings appeal 20234 from that judgment.

We consolidated the appeals, Rule 29.15(*l*), but address them separately in this opinion.

## Appeal 18743

Two of the three points relied on in Appellant's brief pertain to this appeal. Point I avers the trial court erred in allowing the prosecutor to question a witness about "uncharged crimes" allegedly committed by Appellant. Point II asserts the trial court erred in allowing the prosecutor to question a witness about Appellant's "prior convictions."

Because Appellant does not challenge the sufficiency of the evidence to support the verdicts, we recount only the evidence necessary to address the claims of error, viewing it in the light most favorable to the verdicts. *State v. Schaal*, 806 S.W.2d 659, 661 (Mo.

The victim was John Ray Ravellette. He was a friend of Jeffrey Lane Gooch. On Friday, August 16, 1991, Jeffrey[3] and Ravellette were residing in the home of Jeffrey's father, Bobby Gene Gooch, in Laclede County.

That evening, Jeffrey and Ravellette went to a bar. Ravellette, who had been paid that day by his employer, was carrying $150 to $200, so he bought the beer.

Jeffrey and Ravellette left the bar about 1:30 a.m., in Jeffrey's truck. They went to a house in Lebanon where Jeffrey's cousin, Brenda Odorizzi, lived with Darrell Lee Rogers. Darrell's uncle, Melvin Dean Coleman, lived next door with Anna Price.

When Jeffrey and Ravellette arrived (around 2:00 a.m., according to Jeffrey), a party was under way in front of Brenda's and Darrell's residence. Attendees included Darrell, Sherry Ann Odorizzi (Brenda's sister), Coleman and Appellant.

Because Jeffrey was scheduled to work later that morning (Saturday, August 17), he decided to leave the party a few minutes after arriving. Ravellette chose to stay, so Jeffrey asked Ravellette how he would get home. According to Jeffrey, Ravellette said: "Don't worry about it. I'm a big boy." Jeffrey departed shortly thereafter, intending to return after work and retrieve Ravellette.

Around dawn, Sherry Odorizzi decided to leave the party. Because her car was "tore up," she needed a ride. Coleman, who had no driver's license, handed Appellant the keys to a station wagon owned by Anna Price. Sherry, her younger brother, her infant daughter and Ravellette seated themselves in the back seat of the station wagon.[4]

---

1. Although concurrent with each other, the sentences were ordered to run consecutively to a prison sentence in an unrelated case.

2. Rule references are to Missouri Rules of Criminal Procedure (1994).

3. The dramatis personae in this tragedy are numerous. For brevity and clarity, we refer to each by a forename or surname. We mean no disrespect.

4. Sherry's brother was at the party when she arrived. Why he accompanied her when she left is unexplained. Sherry's daughter slept in the house during the party.

Appellant and Coleman seated themselves in front.

Appellant drove the sextet to Sherry's trailer. Sherry, her brother and her daughter went inside. The station wagon departed with Appellant driving, Coleman in the front passenger seat, and Ravellette in the back.

When Jeffrey arose to go to work that morning (Saturday, August 17), his father, Bobby, asked where Ravellette was. Jeffrey explained that Ravellette stayed at the party.

Bobby drove to the party site. Coleman and Appellant were in the yard. Bobby asked if they had seen Ravellette. According to Bobby, Appellant said: "Well, we were riding around.... Well, [Ravellette] hit Dean.... I hit him and put him out on YY Road.... Out there by the lake."

Bobby drove to the area described by Appellant, but failed to find Ravellette.

Jeffrey's boss allowed Jeffrey to leave work around noon August 17. He drove to the party site, finding Appellant there. Jeffrey asked about Ravellette. Appellant said he (Appellant) "dropped him off by YY highway." Appellant mentioned no altercation.

Jeffrey "drove out along YY highway," but failed to find Ravellette.

The next day (Sunday, August 18, 1991), Jeffrey and Bobby went to the Laclede County sheriff's office and filed a "missing person's report" with Joseph Majerak, a reserve deputy sheriff.

Majerak contacted Coleman, who informed Majerak he last saw Ravellette when "they" let him out of the car "in the area of YY–223 and Curly's Lake area." Majerak searched the area, but failed to find Ravellette.

A week later, Jeffrey encountered Appellant at a "drive-in." Jeffrey asked about Ravellette. Appellant responded: "If I wanted to kill somebody I could feed him to the alligators or put him down a well and nobody would ever find him."

On October 6, 1991, a hunter discovered skeletal remains of a human body "in the woods" some fifty feet east of county road X44–263 in Laclede County. Dental records confirmed the remains were those of Ravellette.

An autopsy revealed the left eighth rib was fractured by a bullet found in "tissue that appeared to be a remnant of the lung." The pathologist's opinion was that Ravellette died "as a result of a gunshot wound which penetrated the left side of his chest and that the entrance was located in the left side of the back."

A criminalist at the Missouri State Highway Patrol Forensic Laboratory concluded the bullet "had characteristics which most fit that of an expended .22 caliber class bullet."

The discovery of Ravellette's remains prompted investigators to question Coleman anew. At first, Coleman gave the same account of putting Ravellette out of the station wagon that he had given Majerak immediately after Ravellette's disappearance. However, Coleman eventually admitted he feared Appellant and had given that account at Appellant's insistence.

At trial, Coleman testified that upon leaving Sherry Odorizzi's trailer, Appellant drove himself, Coleman and Ravellette to a trailer near YY highway where Appellant and John Scatterday resided. The trio arrived "after daylight." Scatterday was there, "watching cartoons."

Coleman entered the trailer and began watching cartoons and talking to Scatterday. Appellant entered the kitchen. Coleman could not see Appellant or Ravellette. However, Coleman heard Ravellette say, "You can't kill a man by shooting him there."

Coleman then heard a gunshot. It sounded like "a small caliber weapon."

Coleman turned toward the kitchen and saw Appellant standing with a rifle in his hands. Coleman walked to the kitchen and saw Ravellette lying on the front porch. Ravellette's eyes were open; he was not breathing and appeared dead.

Appellant wrapped Ravellette's body in "a blanket or other quilt or carpet or something." Appellant told Coleman to open the back of the station wagon. Coleman did so. Appellant put Ravellette's body over his shoulder, carried it to the station wagon, and put it in the back.

Asked what occurred next, Coleman testified:

"[Appellant] got in the driver's side and I got in the passenger side and he took off and went down a gravel road and we hit pavement and then went a little bit farther, then we turned onto another gravel road and we took it to the woods, the body."

After dragging the body into the woods, Appellant and Coleman reentered the station wagon and eventually returned to Coleman's residence. Appellant told Coleman what to say if questioned about Ravellette. Coleman added, "[Appellant] told me if he went down he was taking me and my family with him."

Gordon Dwight Gregory, a heavy equipment operator, resided at Route 5, Lebanon, at the time these events were unfolding. When Gregory learned from television about the discovery of Ravellette's body, Gregory went to the sheriff's office and reported that Appellant had appeared at Gregory's residence on a Sunday in August, 1991.

Recounting the incident at trial, Gregory explained that his wife, Beverly Jo, was present when Appellant arrived "right before dark." Appellant asked Beverly to leave the room. She complied. Asked what happened next, Gregory testified:

"He just said that he had been out and got into it with a guy, him and Dean Coleman had been out all night and got into it with a guy and wanted to know, said that they had beat him to death and wanted to know if I would bury the body."

Gregory inferred Appellant asked for Gregory's assistance because Gregory had heavy equipment and lived "pretty close to him."

Gregory laughed at the request. According to Gregory: "I thought he was just going on with nonsense. . . . I just thought it was a drunk talking." Gregory told Appellant he (Gregory) wanted "no part of it."

Later during Gregory's direct examination, this exchange occurred without objection by Appellant's lawyer:

"Q. Has the defendant ever bragged to you about how good a fighter he is at any time?

A. Yes.

Q. Is it your opinion that's something the defendant is proud of?

A. Yes.

Q. In fact, Mr. Gregory, you've had an occasion to get into a scuffle with the defendant before, haven't you?

A. Yes.

 . . . .

Q. . . . when did that fight take place that you and the defendant got into about?

A. Probably about when I first met him, about seven or eight years ago."

On cross-examination, Appellant's lawyer questioned Gregory about his fight with Appellant and asked whether it was well known that Gregory and Appellant had not gotten along since then.

The failure of Appellant's lawyer to object to Gregory's testimony about (a) Appellant's boasting of his fighting prowess and (b) Appellant's fight with Gregory is the basis of a complaint of ineffective assistance of counsel by Appellant in appeal 20234. That issue is addressed in the segment of this opinion adjudicating that appeal. We mention it here to avoid quoting Gregory's testimony piecemeal.

Although Appellant chose not to testify, he presented evidence that he was not prone to use weapons to quell disputes. Kelly Shane Robbins, a longtime friend of Appellant, described an illustrative incident, referring to Appellant as "Lobo," a long-standing nickname:

" . . . I was at a friend's house . . . and the guy got a little bit violent. He pulled a gun on me. Lobo stepped between me and him and stuck his finger in the barrel and told him, said, 'Look, if you're going to shoot somebody you've got to shoot me first.' He took the gun away from the guy and locked the guy in . . . the trunk of his car for about an hour. Once he cooled off he let him out, said, 'Look, you don't pull a gun. That ain't no way to take care of it. Fight him face-to-face.' "

Robbins avowed he had seen Appellant fight and had fought at Appellant's side "to help even the score."

In an apparent effort to cast suspicion on Coleman for Ravellette's murder, Robbins testified Coleman had bragged "about being ... the cheapest hit man in town, if I got somebody bugging me, twenty bucks, I'll knock him in the head for you." Robbins added: "Dean's not the type of person to stand up and fight you face-to-face. He'll grab a club." Exemplifying the difference he perceived between Appellant and Coleman, Robbins gave this narrative of an occurrence in 1989 or 1990:

"Mr. Bransford and Mr. Coleman showed up at my house about three o'clock one morning looking for a friend who just happened to be staying at my house that night. They walked in. Lobo went over to him and told him, 'David, there's no hard feelings against you but I'm going to do this. You done me wrong. I'm going to black your eye.' He hit him and said, 'You got what you deserve, that's all I want.' I don't know if he hit him once or twice. And I started to walk away. I asked him what it was about, you know, well, he kind of told me 'Look, he's done me wrong. I just wanted to blacken his eye for it.'

After this Dean Coleman started, he thought he wanted some of it too. He jumped in and started slapping the guy around.... He kept hitting the guy and kept hitting him, kept mouthing off.... Lobo just grabbed ahold [sic] of him, said, 'Come on, they've asked us to leave three times. I done what I wanted to do.' ... Lobo pulled him, finally got him out of the door...."

Asked about the relationship between Appellant and Gordon Gregory, Robbins testified: "I know they don't get along, haven't for years.... [T]here's always friction between them. There's no friendship there."

Regarding Appellant's attitude toward firearms, Robbins' testimony included this:

"Q. ... Do you know if Lobo ever carried a gun for protection?

A. No . I never figure he needed one.

Q. ... Have you known of him owning one?

A. No.

Q. How about, to your own knowledge, of him ever using a gun on someone?

A. No. sir."

Appellant also presented testimony by Addis William Monroe, a detective sergeant for the Laclede County sheriff's department. Monroe stated he did not believe he would encounter a problem in arresting Appellant, and he (Monroe) had never caught Appellant with a weapon or seen Appellant with a weapon. Monroe's testimony continued:

"Q. And are you saying to this court and this jury that it's your particular relationship with him that causes you to feel that you wouldn't have a problem if you went to arrest him?

A. I don't think I would. I've always been able to talk to him.

. . . .

CROSS EXAMINATION

Questions by [Prosecutor]:

Q. Mr. Monroe, you discussed with [Appellant's lawyer] the character of the defendant. Can you tell us about any prior convictions that you know the defendant has?

[Appellant's lawyer]: Objection.

THE COURT: Overruled. You may answer the question.

THE WITNESS: He has been convicted in Kentucky. He did have drug charges out of Laclede County that he's presently serving. He also has other felony arrests on him, I believe in, don't quote me, but I think it's in the state of Louisiana, and I'm not sure about Louisiana, but I do know he has several felony arrests.

. . . .

Q. What sentence is he serving [on the Laclede County drug charges], what is the length of that sentence?

A. Thirty years.

Q. Do you know of any other prisons that this defendant has been in?

A. I'm not sure if he was in the Department of Corrections in Kentucky or not. I do know he has another sentence hanging over him from Kentucky right now, and I'm not sure about the other

state, I'd have to go get a criminal history on him."

■ Appellant's second point, which we address first, maintains the trial court abused its discretion in allowing the prosecutor to cross-examine Monroe regarding his knowledge of Appellant's prior convictions in that "Appellant did not testify, so his credibility was not in issue, and such testimony constituted inadmissible evidence of other crimes, not necessary to proof of the charges against Appellant, and which served only to prejudice the jury against Appellant."

The State responds that the trial court did not err inasmuch as Appellant "opened the door" to questions about his prior convictions when his lawyer, on direct examination, questioned Monroe about Appellant's "character."

We need not—and do not—decide whether the testimony elicited from Monroe on direct examination put Appellant's character in issue. We dispose of Appellant's second point on a more fundamental ground.

■ The only word uttered by Appellant's lawyer when the prosecutor asked Monroe about Appellant's prior convictions was: "Objection." It is uniformly held in Missouri that specific objections are required to evidence, and the objection must call the attention of the trial court to the ground or reason for the objection. *State v. Lang,* 515 S.W.2d 507, 511[6] (Mo.1974).

In *Lang,* the Supreme Court of Missouri held nothing was preserved for review when the accused's lawyer said, "Objection," during a comment by the prosecutor in closing argument. *Id.* at 511. *Accord: State v. Jones,* 462 S.W.2d 661, 663[2] (Mo.1971), where the utterance, "I object to that," was held insufficient to preserve any issue for appellate review.

Consistent with *Lang* and *Jones,* we hold the claim of error in Appellant's second point is unpreserved for review. At best, it would be eligible for only plain error relief.

■ To be entitled to plain error relief, an accused bears the burden of demonstrating that the action of the trial court was not only erroneous, but that the error so substantially

impacted upon his rights that manifest injustice or a miscarriage of justice will result if the error is left uncorrected. *State v. Wise,* 879 S.W.2d 494, 520[76] (Mo. banc 1994) *cert. denied,* —— U.S. ——, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995).

■ Here, the only specific conviction revealed by Monroe on cross-examination was the Laclede County drug conviction. On redirect examination by Appellant's lawyer, Monroe expressed the belief that the Kentucky conviction was for burglary. Further questioning of Monroe by Appellant's lawyer established that the Laclede County conviction did not involve a weapon and Monroe had no information that the Kentucky conviction involved a weapon.

Because neither conviction mentioned by Monroe was for a crime against a person and there was no showing that either conviction involved a weapon, the convictions did not undermine Appellant's strategy of presenting himself to the jury as someone who would not fight unless provoked and who disdained the use of weapons. We therefore hold Monroe's testimony about Appellant's convictions did not result in manifest injustice or a miscarriage of justice, hence plain error relief is unwarranted.

We next address Appellant's first point. It concerns a segment of the testimony of Beverly Jo Gregory. As reported earlier, she was the wife of Gordon Gregory and was with him at their residence when Appellant appeared there one Sunday evening in August, 1991.[5]

An attentive reader will recall that Beverly left the room at Appellant's request. The conversation that ensued between Gordon Gregory and Appellant is recounted earlier in this opinion. During that conversation, Beverly was in the bathroom. Suspecting the conversation might pertain to a "girlfriend" of her husband, Beverly left the door ajar so she could eavesdrop.

Prior to Beverly's testimony, Appellant's lawyer objected that Beverly's testimony would be "eavesdropping, hearsay ... [and] cumulative." The trial court overruled the

5. At trial, Beverly testified she and Gordon were divorced in January, 1993.

objection. Appellant's lawyer renewed the objection when the prosecutor asked Beverly what she heard Appellant say. Consistent with its previous ruling, the trial court overruled the objection.

Beverly then recounted her recollection of the conversation between Gordon Gregory and Appellant. Beverly's account was similar to Gordon's. After that, this exchange occurred:

"Q. Did the defendant ever brag to you or talk to you about beating up men or women?

A. Yeah, I've heard him say that a number of times.

Q. You've heard him brag about beating up both men and women?

A. Yes. He was the type of person that would talk about, you know, getting in fights with other men and of course he could always win. But he really liked beating on women from the way he talked to me.

There was an occasion, some woman in Florida, that he had been with and she had done something wrong and he, you know, he had beat her up pretty bad, the way he told me, what things he had done to her, because she did something wrong."

At that juncture, Appellant's lawyer, outside the hearing of the jury, told the trial court:

"This is the first time we've heard this. When I interviewed yesterday—we've neither heard anything in the question nor received anything in writing along that line of questions from the witness before and she did not answer the question of this nature to us when we asked her."

The trial court overruled the objection. The prosecutor asked Beverly nothing else about Appellant.

■ Appellant's first point asserts the trial court abused its discretion in allowing the prosecutor to question Beverly "about allegations that Appellant liked to fight with men and beat up men and women" in that such testimony "constituted inadmissible evidence of other uncharged crimes, which was not necessary to proof of the charges against Appellant and served only to prejudice the jury against Appellant."

The State responds that Appellant failed to preserve the point for appellate review inasmuch as he made no objection at trial "on any theory even closely resembling the theory now presented in this appeal."

■ We agree. None of the objections by Appellant's lawyer before or after the testimony about which he complains in his first point were based on the premise that Beverly's testimony constituted evidence of uncharged crimes. A point on appeal regarding admissibility of evidence must be based on the theory of the objection made at trial. *State v. Dampier*, 862 S.W.2d 366, 376[14] (Mo.App.S.D.1993). An accused is not permitted on appeal to broaden the objection he presented to the trial court; he may not rely on a theory different than the one offered at trial. *Id.* Consequently, Appellant's first point, like his second, is, at best, reviewable for only plain error.

■ We find no manifest injustice or miscarriage of justice in the reception of the testimony identified in Appellant's first point. That testimony, like the testimony adduced by Appellant from Robbins (and the testimony received from Gordon Gregory without objection by Appellant), portrays Appellant as a formidable fighter who neither needed nor used weapons to resolve disputes or gain his way with others. Such testimony would bolster the theory that Appellant would have used his fists, not a gun, in any fracas with Ravellette. Indeed, Appellant's lawyer, during final argument, emphasized there was no evidence that Ravellette was beaten or that any of his bones were "broken by the hands of man."

Accordingly, although Beverly's testimony would not endear Appellant to people of normal sensibilities, it was consistent with his theory of defense, or at least not adverse to it. Plain error relief is therefore unwarranted.

Judgment affirmed.

946

## Appeal 20234

Appellant's third point, the only one pertinent to this appeal, avers he was entitled to post-conviction relief, and the motion court clearly erred in denying it, in that Appellant received ineffective assistance of counsel in the trial court. The point asserts Appellant's lawyer ("defense counsel") was inept:

"... by introducing evidence of other crimes and prior bad acts, through the testimony of Kelly Robbins, Bill Monroe, and Melvin Dean Coleman, and by failing to object to the State eliciting such evidence from Gordon Gregory."

Because the point yields no clue as to the testimony on which it is based, we have sifted the argument following the point in an effort to identify the testimony of each of the four witnesses about which Appellant complains.

■ We begin with Coleman. As we understand Appellant's argument, he maintains defense counsel rendered ineffective assistance when, during cross-examination of Coleman, counsel adduced the testimony recounted in the next paragraph.

Defense counsel called Coleman's attention to an incident where, according to Coleman, Appellant asked Robbins to aid Coleman and Appellant in searching for a derringer and "a bag of marijuana" Appellant had tossed from a car. The derringer was found. Coleman avowed he later bought a derringer from Appellant without a "sheriff's permit." Coleman acknowledged the purchase was a violation of the law and, as the transaction occurred while Coleman was on probation, was also a violation of his probation. We henceforth refer to this testimony as "Coleman's derringer testimony."

In evaluating Appellant's complaint about Coleman's derringer testimony, we observe that the prosecutor, during direct examination of Coleman, adduced testimony that Coleman had four "DWI" convictions—one a felony—and is an alcoholic. At the time of Appellant's trial, Coleman was facing a charge of "tampering with physical evidence" (inferably for helping Appellant drag Ravellette's body from the station wagon into the woods).

On cross-examination by defense counsel, Coleman admitted buying alcoholic beverages for Robbins without knowing whether Robbins was 21 years of age.

Robbins, under questioning by defense counsel, testified he had known Coleman "most of my life, since I was a teenager." Robbins continued:

"He used to buy booze for me when I was a kid. He was just an easy connection. If I needed something to drink and I wasn't able to buy it legally at the time, I'd go give him my money and he'd go get my booze."

Defense counsel, called as a witness at the evidentiary hearing in the motion court, testified his theory of defense was: "Mr. Bransford had not committed this homicide, that the State couldn't prove it and that their main witness was a liar and a fool." Consistent with that strategy, defense counsel told the jury in final argument:

"The only evidence that Robert Bransford is at all involved in [Ravellette's] death is Melvin Dean Coleman, a lying drunk who doesn't care about the law of drinking and driving, the handgun permit to purchase laws, ... or the privilege of being on probation....

You cannot, you must not believe Dean Coleman.... He isn't credible. He cannot be believed....

We must return to Melvin Dean Coleman.... He who would take care of somebody for a few dollars. He who bought alcohol for a minor. He who broke his word to the courts and drank when he promised he wouldn't if only they did not lock him up when he got the felony DWI. He who knew he wasn't supposed to possess a firearm and went out and purchased ... a .38 caliber gun while on unsupervised probation. He knew he was supposed to get a sheriff's permit first to purchase a handgun."

It is obvious that defense counsel used Coleman's derringer testimony to attack Coleman's credibility. Furthermore, as explained in the next paragraph, defense counsel presented testimony from Robbins that

contradicted Coleman's version of the incident.

Robbins testified Coleman told him that he (Coleman) dropped the derringer while urinating in a roadside ditch. Appellant enlisted Robbins to help Coleman find the derringer because Robbins has "excellent eyesight." Robbins avowed he found the gun, describing it as "one of those little back pocket jobs, one of them you want to surprise somebody with if they didn't know you had it." Coleman took the gun from Robbins, saying, "Thank you, I didn't need for that to get in the wrong hands." According to Robbins, Coleman "stuck it in his back pocket."

Asked whether he ever saw Coleman use a weapon, Robbins replied:

"I seen him pull a gun at parties one night. I supposed it was this little piece.... I supposed that that was that little .25 that I helped him find that night.... He basically got too mouthy and got in more than he could handle and when he figured out he wasn't going to be able to fight his way out he pulled it."

The State argues, and we agree, that defense counsel presented Coleman's derringer testimony in an effort to discredit Coleman and create suspicion that Coleman, not Appellant, inflicted the fatal wound on Ravellette. As discussed *infra*, the motion court, as we comprehend its findings, reached the same conclusion.

■■■ We next address Appellant's complaint regarding testimony adduced by defense counsel from Robbins. We glean from the argument in Appellant's brief that he refers to Robbins' testimony about (a) the derringer search, and (b) the incident at Robbins' residence when Appellant and Coleman hit a man who had "done [Appellant] wrong."

We have already considered Robbins' testimony about the derringer search, concluding—as did the motion court—that defense counsel's presentation of it was trial strategy.

As to the incident at Robbins' residence, the State asserts it was "just another attempt [by defense counsel] to make Coleman look like the bad guy."

We agree. The thrust of Robbins' testimony was that after Appellant hit Robbins' guest, Coleman, who apparently had no score to settle, inflicted more blows than Appellant, and Appellant ultimately had to forcibly remove Coleman from the residence. As noted *infra*, it appears the motion court reached the same conclusion, i.e., that the presentation of Robbins' testimony about the incident at his residence was trial strategy.

■■■ We turn next to Appellant's complaint about defense counsel's failure to object to testimony elicited by the prosecutor from Gordon Gregory. We quoted that testimony earlier in the segment of this opinion adjudicating appeal 18743.

As to Gregory's testimony about Appellant's boasting of his fighting prowess, we held in denying Appellant's first point that similar testimony from Beverly Gregory was consistent with the hypothesis that Appellant was an able fighter who neither needed nor used weapons in confrontations with others. Consequently, it fit defense counsel's trial strategy.

■■■ As to Gregory's testimony about a fight with Appellant years earlier, we note defense counsel used that incident to attack Gregory's credibility. As reported earlier, defense counsel presented testimony by Robbins that Gregory and Appellant had not gotten along for years and there was friction between them. Utilizing such testimony in final argument, defense counsel told the jury:

"These two men, Gordon [Gregory] and Lobo, had fought before. Fights tend to create grudges in small towns. Grudges tend to last a bit longer when there's not much else to do."

Appellant presented his complaints about the testimony from Gregory, Robbins and Coleman to the motion court in his motion for post-conviction relief. As we understand the motion court's cryptic findings, it concluded that defense counsel's decisions regarding such testimony were either matters of trial strategy or attacks on credibility of witnesses, and that defense counsel "was not incompetent" in any respect complained of by Appellant.

■ Our review of the motion court's denial of post-conviction relief is limited to a determination of whether its findings and conclusions are clearly erroneous. Rule 29.15(j)[6]; *State v. Parker*, 886 S.W.2d 908, 932–33[104] (Mo. banc 1994), *cert. denied*, ___ U.S. ___, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995).

■ To prevail on a claim of ineffective assistance of counsel, a prisoner must show that his lawyer failed to exercise the customary skill and diligence that a reasonably competent lawyer would have exercised under similar circumstances, and that the prisoner was thereby prejudiced. *Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987). In adjudicating a complaint of ineffective assistance, a court must eliminate the distorting effects of hindsight, reconstruct the circumstances of counsel's challenged conduct, and evaluate the conduct from counsel's perspective at the time. *Id.* at 858. There is a strong presumption that counsel's conduct was proper. *Id.* Strategic choices made after a thorough investigation are virtually unchallengeable. *State v. Rodgers*, 899 S.W.2d 909, 913[9] (Mo.App.S.D.1995). The selection of evidence to introduce is largely a matter of trial strategy, which is not a foundation for finding ineffective assistance of counsel. *State v. Zimmerman*, 886 S.W.2d 684, 695[36] (Mo.App.S.D.1994).

Applying those well established principles, we hold the motion court committed no clear error in finding defense counsel did not render ineffective assistance regarding the testimony of Gordon Gregory, Robbins and Coleman complained of in Appellant's third point.

■ Appellant's complaint about defense counsel's introduction of evidence of "other crimes and prior bad acts" through the testimony of Detective Sergeant Monroe is a matter about which defense counsel was questioned at the evidentiary hearing in the motion court.

Defense counsel testified he did not want to call Monroe because Monroe's testimony "might open up the door into other things."

Defense counsel avowed Appellant insisted on calling Monroe because Appellant wanted "to bring in evidence that he was not known to be a violent person and certainly not known to be one who used weapons." Defense counsel advised Appellant that calling Monroe was against counsel's "better judgment," but "it will be your decision." According to counsel, Appellant said "Let's go for it." Defense counsel thereupon called Monroe.

The motion court obviously believed defense counsel. The motion court found:

"The Court finds that Movant's own directions to his attorney were to put Officer Bill Monroe on the stand and question him about the Movant's character. The Movant's attorney advised him not to put Officer Monroe on the stand and question him about his knowledge of Movant or character evidence would be submitted. Movant insisted that Officer Monroe be called."

In his brief, Appellant blithely ignores defense counsel's testimony and the motion court's findings, apparently hoping we would not examine the record.

In insisting that defense counsel call Monroe, Appellant made a choice analogous to that of the accused in *State v. Ervin*, 835 S.W.2d 905 (Mo. banc 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). There, the accused chose to forego a lesser included offense instruction in a first degree murder case, preferring to adopt a "go for broke" strategy. 835 S.W.2d at 932. On appeal, he complained his lawyer rendered ineffective assistance in failing to submit a second degree murder instruction. *Id.* Rejecting the claim, the Supreme Court of Missouri held:

"Having chosen incorrectly, [the accused] now insists that his trial attorney should not have permitted this choice. It is not ineffective assistance of counsel to follow a knowing and voluntary waiver of a right by a defendant as part of trial strategy formulated in consultation with that defendant."

*Id.* at 932–33[66].

Applying *Ervin*, we hold the motion court in the instant case did not clearly err in

6. As stated in footnote 2, *supra*, Rule references are to Missouri Rules of Criminal Procedure (1994). The above standard of review is set forth in Rule 29.15(j) in the 1994 version. The standard of review now appears, unchanged, in Rule 29.15(k) which took effect January 1, 1996.

exonerating defense counsel of ineffective assistance in the decision to call Monroe as a witness.

The order denying post-conviction relief is affirmed.

### Pro se motions after submission

After this court took these appeals under submission, Appellant filed a pro se motion to "disqualify" his appointed appellate counsel and a pro se motion seeking an order from this court remanding the case to the trial court with a directive that the trial court permit Appellant to file an untimely motion for a new trial on the grounds of "newly discovered perjury evidence, prosecutorial misconduct, and fraud."

Attached to the motions was an affidavit ostensibly signed by John D. Coleman, who identified himself as the son of Dean Coleman. The address of John Coleman shown on the affidavit appears to be the address of the Jefferson City Correctional Center.

According to the affidavit, Dean told John and John's "girlfriend," Debbie Sue Ogle, on Thanksgiving, 1993 (some eight months after Appellant's trial), that he (Dean) was coerced by the police and prosecutor to give false testimony against Appellant. Specifically, says the affidavit, Dean revealed he did not witness Appellant shoot Ravellette. The affidavit states John told no one about Dean's admission until John signed the affidavit February 22, 1995.

John's affidavit was accompanied by a similar affidavit ostensibly signed by Debbie Sue Ogle. Like John's affidavit, Debbie's affidavit states Dean told her and John on Thanksgiving, 1993, that he (Dean) did not witness Appellant shoot Ravellette. Debbie's affidavit is dated March 8, 1995, and states she told no one about Dean's admission until that date.

The authority of this court to remand a case to a trial court so an accused can file an untimely motion for new trial on the ground of newly discovered evidence is thoroughly discussed in State v. Hill, 884 S.W.2d 69, 75–77 (Mo.App.S.D.1994), cert. denied, — U.S. —, 115 S.Ct. 1380, 131 L.Ed.2d 234 (1995). Such relief is granted only in "exceptional circumstances" when the newly discovered evidence will exonerate the accused. 884 S.W.2d at 76. Evidence "merely of an impeaching nature" does not warrant such relief. Id.

As reported in the segment of this opinion adjudicating appeal 18743, Dean Coleman never testified he saw Appellant shoot Ravellette. Dean testified only that when he turned toward the kitchen after hearing the gunshot, he saw Appellant standing with a rifle in his hands. Consequently, a statement by Dean that he did not witness Appellant shoot Ravellette would neither exonerate Appellant nor contradict Dean's trial testimony. Furthermore, neither affidavit is by Dean, and neither affidavit explains why the affiant kept Dean's alleged revelation a secret for 15 months.

We therefore hold Appellant, like the accused in Hill, has failed to meet the requirements for an order of remand. Appellant's motion seeking that relief is denied. Appellant's motion to disqualify his appellate counsel is based on counsel's alleged refusal to pursue such relief. That motion is likewise denied.

PREWITT, P.J., and SHRUM, C.J., concur.