### STATE of Missouri, Respondent,

v.

### Dwight BURNS, Appellant.

### No. 46677.

Supreme Court of Missouri,

Division No. 2.

March 9, 1959.

Motion for Rehearing or to Transfer to Court En Banc Denied April 13, 1959.

Henry G. Morris, Frank E. Doyle, James C. Porter, St. Louis, for appellant.

John M. Dalton, Atty. Gen., Richard R. Nacy, Jr., Special Asst. Atty. Gen., for respondent.

EAGER, Judge.

Appellant, Dwight Burns, was convicted of grand larceny and imprisonment for five years was assessed. The jury found him not guilty of burglary, and made no finding on a charge of prior felony con-

victions. We shall refer to appellant as the defendant. He and others were charged by information filed in St. Francois County with burglary and larceny, but a change of venue was granted to Ste. Genevieve County; a severance was also granted and defendant was tried separately. The offense charged occurred on August 11, 1955, and it was, therefore, subject to the provisions of §§ 560.155 and 560.160, RSMo 1949, V.A.M.S., defining and fixing the punishment for grand larceny. (All statutory references will be to RSMo 1949, V.A.M.S., unless otherwise stated.) The present statutes on "Stealing," §§ 560.156 and 560.161, 1957 Supp., first became effective on August 29, 1955. Motion for new trial was regularly filed and overruled, and sentence was imposed.

The charge was of burglarizing the house of one Taff Skaggs and of stealing and carrying away various groceries of the value of $35. Various items were listed in the information by name, and at the trial the State was allowed to amend by adding, after the items so listed, the words "miscellaneous groceries and tobacco." The evidence of the State fairly showed the facts now related. Taff Skaggs, his wife Sara Mae, and their five children lived in a two-room house, not entirely completed, on Highway 47 west of Bonne Terre in St. Francois County. This house had one door, one window opening covered with sheet metal, and a dirt floor. One or both of the parents received monthly checks for child aid; this income was apparently the family's then sole means of support. The father's sight was seriously impaired. Shortly before noon on August 11, 1955, the family went to a store at Mineral Point, and bought groceries for a month, paying $43.63 out of a child-aid check. Mrs. Skaggs received a grocery ticket or bill, listing the items, and consisting of three small sheets. Most of the groceries were placed in two boxes but three items were carried separately. When the family returned home early in the afternoon they put the groceries in the house, locked the door, and went to get drinking water at a church some two miles or so away. They rode in an old car, driven by a deaf and dumb boy. When they returned they saw, from the highway, that defendant's car was parked in their yard; they also saw defendant coming around the house with a box of groceries, and one George Nash following him with another box of groceries; a woman described as Pat Jolly was at the car holding the door open, and a girl named Mary Smith was sitting in the car. Nash fell down and spilled his groceries, but defendant picked them up and (in the words of Mrs. Skaggs) "throwed 'em in the car." Thereupon the intruders drove off down the highway. The defendant was definitely identified. Mr. and Mrs. Skaggs looked hurriedly in the house, saw that all the groceries were gone except a bucket of lard, two dozen eggs and a sack of potatoes (which had not been in the boxes), and that the metal sheet was torn from or pried off of the window. They then drove to her brother's house, several miles away, to which place the defendant and his named associates came a little later, stopping outside. It appears that the Skaggses supposedly owed defendant some money on the purchase of a car, and owed Nash $3 on a washing machine. Mrs. Skaggs paid defendant $5 and Nash $3, out in the road in front of her brother's house; she testified that she thought that if she did so they might give the groceries back; however, they did not. Apparently, neither Mr. nor Mrs. Skaggs thought himself or herself in position to challenge the defendant and his cohorts at any time about taking the groceries. Mr. Skaggs reported the matter to the authorities the next morning and defendant was arrested. Evidence was received without objection: that Nash had admitted orally to a Sergeant of the Highway Patrol that he and the defendant had taken the groceries from the home and that they had pried "the tin off the window"; also, that defendant had stated orally to the officer that he was at

the house, but that he did not take the groceries or break in, and that they went there because "these people owed them some money." The Skaggses had known the defendant, Nash, and Pat Jolly for years; Pat Jolly was also referred to as Mrs. Dwight Burns. Some of the foregoing testimony was corroborated by Mary Smith (Peppers) who had since been married and separated. Her testimony was objected to, but the objection is not briefed here and is therefore waived. She testified: that she did not see defendant carry out any groceries, but that there were some in the car when she got back from "under the bridge"; that Nash dropped some groceries and the defendant helped "put 'em in the car"; that "they" said George had gotten in through the window; that Mrs. Skaggs "motioned for 'em to stop"; that after they left the house Nash and defendant put the groceries in the trunk; also, that she told defendant and Nash, "in a joking way," that they ought to give the groceries back after Mrs. Skaggs had paid them the money; that, however, they all drove to a house which she "guessed" was Burns' and Pat Jolly's and she and Pat helped put the groceries in the cabinet. This girl was 15 years old at the time of the occurrence and 18 at the time of trial. Other facts will be referred to in the course of the opinion.

■ We note here that the statement of facts in appellant's brief is in direct violation of Rule 1.08(b), 42 V.A.M.S. Except for a recital of the contents of the information, it consists solely of detailed statements of the testimony of each witness, separately; such statements may properly follow a general statement of the facts, if desired, but they should not be used to replace the "fair and concise statement" of all the relevant facts required by the rule. We shall consider the merits in this instance as certain matters of public interest are involved.

■ It is urged that the State failed in its proof. It seems obvious from the foregoing that the evidence was sufficient to prove the elements of larceny. The groceries were gone, and defendant was definitely identified as one of those who actually carried them away. (See § 560.-155.) It was wholly unnecessary under the circumstances to identify the specific items contained in the boxes as they were being carried away. Defendant was acquitted of burglary and the elements of that offense are not involved. The information charged that the groceries "were the property of Taff Skaggs"; and defendant now argues that this was not proven. On this point defendant cites no authority. It is certain from this evidence that they were the property of Skaggs or his wife, or both. Section 546.080 provides expressly that any variance between the statement in an information and the "evidence offered in proof thereof, * * * in the ownership of any property named or described * * *" shall not be ground for acquittal unless the trial court shall find such variance to be material and prejudicial. And see on this point: State v. Quinn, Mo., 142 S.W.2d 79; State v. Sturrs, Mo., 51 S.W.2d 45, 46; State v. Smith, Mo., 252 S.W. 662, 665; State v. Barker, 64 Mo. 282. The principle announced in the statute has long been the fixed law. There is no showing that this point was ever raised in or presented to the trial court; certainly, it made no finding thereon. The point is wholly without merit. Counsel also urge that the State failed to prove that the value of the groceries taken was $30 or more. This contention is primarily directed at the order permitting the amendment of the information by adding the words: "miscellaneous groceries and tobacco"; this, of course, allowed proof of the theft of additional items. We need not discuss the contention or the amendment, for the judgment is to be reversed on other grounds, and the State will have ample opportunity to take such action as it may deem appropriate, considering the extended objections made here.

The following facts were developed at the hearing of defendant's motion for a new trial, upon the assignment that defendant was deprived of a fair trial by reason of the conduct of the prosecuting attorney. We glean these facts largely from the testimony of the prosecutor, Mr. David L. Colson. In or prior to November, 1956, Mr. Colson, then an attorney of St. Francois County, but not yet in office as prosecutor, interviewed defendant in the jail at Farmington at the latter's request and was then employed by him as counsel. At that time defendant gave to Mr. Colson a money order; upon cashing this he took $60 as a partial fee, returning the balance of the proceeds. Later, and in November, defendant consulted Mr. Colson at his office and a rather lengthy statement or memorandum of the facts was written by Mr. Colson, which is shown in full in the record here. This, generally, outlined defendant's version of the whole affair; essentially, it demonstrated that defendant admitted his presence at the Skaggs' place, but laid the theft on George Nash. At the time of this interview Mr. Colson had been elected Prosecuting Attorney of St. Francois County; he subsequently took office on January 1, 1957. The case was then set for trial on December 14, 1956. Mr. Colson told defendant or his St. Louis counsel that he could not represent defendant after the first of the year; he felt that he could "get him freed" before that time; he also felt that there were "certain facts that might indicate" defendant's innocence; he checked defendant's story with Mrs. Burns (presumably "Pat Jolly") and realized that "there was a discrepancy in his story." The case went off the December, 1956, trial list and Mr. Colson testified that he "discontinued" defendant's representation then, but filed no withdrawal; defendant had also, as indicated, employed St. Louis counsel with whom Mr. Colson had corresponded briefly. After January 1, 1957, Mr. Colson requested the Attorney General to assign an assistant to prosecute this case, but he was advised that it should be handled by his own assistant. He testified that he then turned the case and the file over to his assistant, Mr. May, but did not tell him the facts acquired at his conference with the defendant. At some time in the spring of 1957, one of defendant's St. Louis counsel asked Mr. Colson how he could go ahead and prosecute this defendant when he had represented him, but Colson replied that "Mr. May would be handling the case * * *." It is definitely shown that Mr. Colson appeared for the State at the making of the order granting the change of venue to Ste. Genevieve County, that he participated in certain correspondence with defendant's counsel, talked with one or more of them by phone, and that he appeared in court during October, 1957, the month of the trial, and actively opposed a continuance of the case. Upon the latter occasion the defense had asked a continuance because of the absence from the State of defendant's principal counsel; to use Mr. Colson's own words, in referring to that occasion, he said: "Well, I informed the Judge that we would like to have it tried on that date, yes, sir." His letter of October 17, 1957, to defense counsel stated that he would oppose any application for continuance, and that "we are anxious to try the case * * *." That letter bears his initials (to indicate the one who dictated the letter) and his signature. It is further shown that on the evening before the trial Mr. Colson prepared or, as he says, "looked up," the instructions at the request of his assistant; they were typed in his office on the morning of the trial. Mr. Colson was in the courtroom during the latter part of the State's case (apparently without the knowledge of defendant's counsel), and he appeared in the court's chambers at the close of the evidence and presented the State's instructions to the court; he said that, as he recalled, there was not much discussion of the instructions, but that he said to the court: "Here are the instructions, Your Honor." It was very frankly

admitted here in oral argument that Mr. Colson drew, submitted, and argued the instructions. There is no showing that the trial court was ever advised of Mr. Colson's prior representation of the defendant until the filing of the motion for new trial. Mr. Colson's conduct in taking adverse positions was assigned in the motion for new trial as action depriving defendant of a fair and impartial trial; defendant's counsel urge here his constitutional right to a fair trial, and state that they did not discover these recited facts fully until after the trial. They cite cases to the general effect that one who has any personal interest in a prosecution should not conduct the State's case, but should disqualify. State v. Jones, 306 Mo. 437, 268 S.W. 83; State v. Nicholson, Mo.App., 7 S.W.2d 375. These cases are not directly in point. The State counters with the contentions that no prejudice has been demonstrated, that Mr. Colson took only a minor part, and that no objection to his conduct was made at the time or times in question. The latter statement seems to be true, in so far as the trial was concerned. Some protest seems to have been made earlier, as indicated. We think that the case of State v. Howard, 118 Mo. 127, 24 S.W. 41, cited by the State, is distinguishable on its facts. Counsel there, although nominally appointed to represent defendant, apparently had never appeared in the cause for the defendant, "did not advise with defendant as to the merits of the cause; and was excused from further service, * * *" The court there concluded that such counsel (who had later assisted the State's attorneys) had not "obtained such knowledge of any facts which it would be prejudicial to his former client to communicate." It is true that the court there commented on the failure of the defense to "bring the matter to the attention * * * of the lower court," as one ground for its adverse ruling on the point when raised on appeal. But we are not advised of the extent of the participation in the trial by such counsel there, or of the cor-

responding opportunity for objection and notice of the facts. We do not regard that case as controlling.

We are dealing here with something more than a question of technical error; this matter directly affects the conduct of the bar and the administration of criminal justice, as well as the basic rights of defendant. In matters directly affecting the public interest the courts sometimes raise certain questions "ex mero motu." State ex rel. McMonigle v. Spears, 358 Mo. 23, 213 S.W.2d 210, 212; Harris v. Bates, 364 Mo. 1023, 270 S.W.2d 763; State ex rel. Alton R. Co. v. Shain, 346 Mo. 681, 143 S.W.2d 233, 240. And when an error or wrong is committed in the course of a criminal trial, so grievous as to prevent a fair trial, the trial court may intervene of its own motion and without objection, and may, if necessary, declare a mistrial. State v. Laster, 365 Mo. 1076, 293 S.W.2d 300, certiorari denied Laster v. State, 77 S.Ct. 237, 352 U.S. 936, 1 L.Ed.2d 167; State v. Rhoden, Mo., 243 S.W.2d 75; State v. Morris, Mo., 248 S.W.2d 847, 852; State v. Sickles, 220 Mo.App. 290, 286 S.W. 432. And the trial court may, for the same cause, grant a new trial. State v. Rhoden, supra. If the trial courts have that inherent power, we see no reason why the appellate courts should have less. And see, specifically, 3 Am.Jur., Appeal & Error, § 248, p. 33, and cases cited (also, pocket parts). The point was fully presented to the trial court on motion for new trial and it is renewed here.

It is impossible to tell precisely how active Mr. Colson may have been in the prosecution, or whether the information he procured from the defendant played any part therein, directly or indirectly. But the very fact that he had acquired that information as counsel for the defendant, and that he might use it, renders his subsequent position wholly untenable. 5 Am. Jur., Attorneys at Law, § 66, pp. 297–298; 52 A.L.R.2d 1245, note. We accept his testimony that he did not turn the memo

randum over to his assistant. For our purpose it is sufficient that he did participate actively in certain material steps in the case, having previously represented defendant and having acquired full and complete knowledge on the merits from the defendant. Certainly, Mr. Colson personally opposed a continuance at a time vital to the defendant, and certainly, he prepared all the instructions for the State, a most vital step, and one for which the author should be prepared by a full knowledge of the facts. In pursuing these steps, if he did no more, Mr. Colson placed himself in a position antagonistic to the defendant, and wholly inconsistent with his prior employment. See, generally, Hoffman v. Hogan, 345 Mo. 903, 137 S.W.2d 441, 446. And such conduct may work a reversal of the case, in addition to any other recourse therefor. 52 A.L.R.2d loc. cit. 1286 et seq. We shall not attempt to weigh or measure the actual prejudice in a case of this kind, and we do not consider a more specific showing of prejudice to be necessary. The acts were such as to infringe upon the generally recognized concepts of proper conduct of prosecuting officials. Specifically, the acts constituted a violation of Rule 4.06 prohibiting the representation of conflicting interests. See also, generally, 5 Am.Jur., Attorneys at Law, § 66, pp. 297–298; 51 A.L.R. 1307 et seq., note; Ann.Cas.1912B, 212, note; 7 C.J.S. Attorney and Client § 48, pp. 827–829. We do not mean to attribute intentional misconduct to Mr. Colson; but prosecuting officials, like Caesar's wife, "ought to be above suspicion." (Roman Apophthegms, Caesar.) The judgment will be reversed on this ground. We might well hold that the conduct of the trial in the manner here complained of constituted a deprivation of due process, but that we deem to be unnecessary.

■ Two further points should be mentioned in view of another trial. Objection was made to the admission of the grocery bill for the reasons that it included items not listed in the information, and that it was not properly identified by Mrs. Skaggs, who could not read. Mrs. Skaggs showed sufficient familiarity with the bill and its contents, including an ability to read certain figures thereon, to permit the identification. It was her bill, and it had been in her possession; moreover, the circumstances were such as to impress its features and characteristics indelibly upon her mind. Furthermore, her independent recital of the items purchased was corroboratory of her identification. The first ground of the objection need not be considered in view of the amendment of the information and a retrial.

■ When the Sheriff of St. Francois County was on the stand, counsel for the State asked him if he had to go to Michigan in August, 1956, and bring defendant back "on extradition." The witness nodded an affirmation. Objection was made that the matter was irrelevant and prejudicial and a mistrial was asked. Such was the sole question asked concerning any supposed flight from the State. The date fixed in the question was a year after defendant's original arrest. The record fairly shows that defendant was on bond. Generally, evidence of flight to avoid arrest or prosecution is admissible, State v. Nienaber, 347 Mo. 615, 148 S.W.2d 1024, 1027; State v. Davis, 337 Mo. 404, 84 S.W.2d 633; State v. Duncan, 336 Mo. 600, 80 S.W.2d 147, 153. And the defendant has the right to "refute any incriminating circumstances that may be shown." State v. Craft, 344 Mo. 269, 126 S.W.2d 177, 180. If similar evidence is to be adduced at another trial, the State's counsel may consider the objection now urged that a mere arrest in another state is not sufficient to constitute evidence of flight to avoid prosecution.

For the reasons already given, the judgment is reversed and the cause remanded.

STORCKMAN, P. J., and JAMES W. BROADDUS, Special Judge, concur.