STATE of Missouri, Plaintiff–
Respondent,

v.

Jeremaine T. PERRY, Defendant–
Appellant.

No. 21346.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 24, 1997.

Motion for Rehearing or Transfer
Denied Oct. 16, 1997.

Application to Transfer Denied
Nov. 25, 1997.

James R. Wyrsch, Jacqueline A. Cook, Charles M. Rogers, Wyrsch, Hobbs, Mirakian & Lee, P.C., Kansas City, for Defendant–Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joanne E. Joiner, Asst. Atty. Gen., Jefferson City, for Plaintiff–Respondent.

BARNEY, Judge.

Jeremaine Perry (Defendant) was convicted by a jury of second degree murder pursuant to section 565.021 [1] for killing his grandfather, Samuel Arthur Duke, Sr. Defendant was sentenced to a term of life imprisonment

1. All statutory references are to RSMo 1986, unless otherwise indicated.

in the Missouri Department of Corrections. Defendant appeals.

This Court considers the facts and all reasonable inferences therefrom in the light most favorable to the verdict and rejects all contrary evidence and inferences. *State v. Phillips,* 940 S.W.2d 512, 515 (Mo. banc 1997); *State v. Wright,* 941 S.W.2d 877, 879 (Mo.App.1997).

On January 2, 1993, Defendant was home with his grandfather, Samuel Arthur Duke, Sr., in Springfield, Greene County, Missouri. Defendant was fifteen years-old. Defendant's parents were scheduled to return to Springfield from St. Louis later that evening.[2]

At approximately 1:30 p.m., Defendant told his grandfather that they needed some cereal. Before departing to the store to purchase some cereal, Defendant's grandfather noticed that the car was dirty, so he questioned Defendant as to whether Defendant had been driving the car. Defendant professed to his grandfather that indeed he had driven the car to a party the night before, without permission. Defendant was informed by his grandfather that Defendant's parents would have to be told about Defendant's unauthorized use of the car. Following that conversation, Defendant's grandfather drove to the store, purchased some cereal and returned home.

After Defendant consumed some cereal and watched a football game on television with his grandfather, Defendant went to his bedroom where he developed a "feeling" that he wanted to "kill [his] grandfather." While Defendant was alone in his bedroom watching another football game on television, the "feeling" subsided. After a trip to the bathroom, however, the "feeling" that Defendant wanted "to kill [his] grandfather" returned.

Defendant then decided to go to his grandfather's bedroom, where he fervently searched for a gun. Defendant remembered seeing a rifle in his grandfather's bedroom from when he was there the previous summer. Defendant located a .22 caliber rifle and a shotgun in the closet. Defendant took the weapons back to his bedroom where he loaded the .22 caliber rifle with at least two bullets.

Defendant then placed the loaded rifle down on the floor in the hallway, walked slowly up the hallway so as not to be detected, and then slowly looked around the corner and found his grandfather's back facing him while he was in the kitchen. Defendant's grandfather was preparing a jelly sandwich.

Defendant then retrieved the rifle, walked up the hallway and aimed the rifle at the back of his grandfather's head and squeezed the trigger. A .22 caliber bullet entered the back of Defendant's grandfather's head. Defendant observed "blood coming out the back of his [grandfather's] head" as his grandfather fell backwards to the floor. Defendant then aimed the rifle down toward his grandfather's forehead and fired the rifle a second time. Defendant believed that "two [bullets] in the head would kill him."

After shooting his grandfather and returning the weapons to his grandfather's bedroom closet, Defendant went to a friend's house where he stayed for about one hour before returning home. Immediately after Defendant returned home, he hurriedly exited the house and ran across the street to a neighbor's house. Defendant related to his neighbor that he had just returned home and found his grandfather lying on the floor, dead. The neighbor testified that he asked Defendant if perhaps Defendant's grandfather was only hurt, but Defendant exclaimed "[n]o, he's dead ... [h]e's laying in a pool of blood with a gunshot, with a bullet hole in his head." The neighbor telephoned 911.

After the ambulance and police arrived, Defendant explained to the Springfield police that upon returning home from his friend's house he discovered his grandfather lying on the floor, dead. Defendant initially related to the police that he had no knowledge of the events leading to his grandfather's demise. Defendant remained with his parents after they returned from St. Louis later that day.

---

2. Much of the following statement of facts was derived from separate statements made by Defendant to Detective Doug Thomas of the City of Springfield Police Department and others, after being informed of and after waiving his constitutional rights.

With Defendant's mother and step-father present, Defendant made voluntary recorded statements to Springfield Police Detective Doug Thomas on the day of murder, January 2, 1993, and the day following, January 3, 1993. Juvenile Officer Perry Epperly was also present during each interview. During these two recorded statements, Defendant maintained that he had no knowledge about what happened to his grandfather.

On the afternoon of January 3, 1993, the victim's son, Samuel Duke, Jr., arrived in Springfield and engaged Defendant in a conversation regarding what happened. Mr. Duke testified during Defendant's trial that Defendant told him that after Defendant returned home from his friend's house, he found a white man, wearing a tie and carrying a brief case, who knocked Defendant down and stated "[m]mm, mmm, two niggers in one day." Mr. Duke, an Oklahoma City Police Detective, did not believe Defendant. Later that evening Defendant admitted to Mr. Duke that he had shot his grandfather but that it was an accident.

On the next day, January 4, 1993, with his mother and step-father present, Defendant voluntarily made another recorded statement to Detective Thomas wherein he admitted that he had shot his grandfather but explained that it was an accident. Defendant explained to Detective Thomas that his grandfather had brought a rifle into the living room and handed it Defendant. Defendant stated that during the course of his handling the rifle, it accidentally fired and that the bullet struck his grandfather's head. Defendant then told Detective Thomas that the gun fired a second time but that he was not sure where the bullet traveled.

On January 7, 1993, Defendant voluntarily appeared at the police station again to make a recorded statement with Detective Thomas. This time, Defendant's attorney, Mr. Dee Wampler, was present during Defendant's interview. Defendant changed his story again and confessed to Detective Thomas that on the day of the murder he developed feelings of wanting to kill his grandfather after his grandfather questioned him about

his use of the car. Defendant related to Detective Thomas that he located a .22 caliber rifle in his grandfather's closet, loaded at least two bullets in its chamber and then shot his grandfather in the head.

An autopsy was performed on Samuel Arthur Duke, Sr., by Dr. James Spindler on January 4, 1993. The autopsy confirmed that the victim was shot twice in the head with a small caliber rifle. Following Defendant's fourth interview with Detective Thomas, Defendant was charged with first degree murder. Defendant was a juvenile at the time of the murder but was certified to be tried as an adult pursuant to section 211.071. Defendant was ultimately convicted of murder in the second degree and was sentenced to life imprisonment. Defendant assigns twelve points of trial court error, and in addition to more specific allegations of trial court error, Defendant generally maintains that his rights under the Fifth, Sixth, Fourteenth Amendments to the United States Constitution and Article I of the Missouri Constitution were violated.

We review a trial court's decision to deny a motion for new trial on the basis of an abuse of discretion; that is, when the trial court's ruling clearly offends the logic of the circumstances or when it becomes arbitrary and unreasonable. *State v. McNeal,* 880 S.W.2d 325, 330 (Mo.App.1994). On review of a motion to direct a verdict of acquittal, we look only to whether there was sufficient evidence from which reasonable persons could have found Defendant guilty beyond a reasonable doubt. *Id.; see State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989).

I.

In Defendant's first point, he maintains that the trial court erred in denying his motion for new trial, arrest of judgment and judgment of acquittal. He asserts that his constitutional rights to due process, a fair trial and right to counsel were violated when special prosecutors in the case obtained privileged attorney-client communications from Defendant's former attorney, Mr. Dee Wampler.[3] Defendant maintains that the special

3. The special prosecutor told the trial court that

Mr. Wampler would testify that during the Janu-

prosecutors in this case should have been disqualified [and new special prosecutors appointed]. Defendant asserts in his brief that "[o]nce the Special Prosecutor received confidential information, a conflict of interest developed which mandated disqualification."

We note that a motion to disqualify the special prosecutors in this case is conspicuously absent from the record. Moreover, this Court was not directed to any portion of the record where Defendant specifically objected to the special prosecutors' presence during the trial.[4] *See State v. Bransford,* 920 S.W.2d 937, 944 (Mo.App.1996); *State v. Miller,* 870 S.W.2d 242, 246 (Mo.App.1994).

Defendant argues, however, that the trial court was aware that Defendant believed the special prosecutors should have been disqualified but that the trial court "never did rule on the Defendant's objection ... based on the ... conflict of interest."

■ "In order to preserve an allegation of error on appeal there must be a proper objection *and* there must be an adverse ruling." *State v. Rodney,* 760 S.W.2d 500, 504–05 (Mo.App.1988); *see also State v. Blakeburn,* 859 S.W.2d 170, 177 (Mo.App.1993). Defendant was required to obtain a ruling from the trial court to preserve his issue for appeal. *Id.*

■ Although we determine that the issue was raised for the first time in Defendant's motion for new trial, and therefore, not generally reviewable on appeal, due to the severity of Defendant's sentence we will review his assignment of error for plain error pursuant to Rule 30.20.[5] Such plain error affecting substantial rights may be considered when the court finds that manifest injustice or miscarriage of justice has resulted. *Id.; State v. Sutherland,* 939 S.W.2d 373, 379–80 (Mo. banc 1997).

The principal cases cited by Defendant to support his contention that a "conflict of interest" existed with respect to the special prosecutors in this case do not avail his point relied on.

First, Defendant relies on *State v. Ross,* 829 S.W.2d 948 (Mo. banc 1992). In *Ross,* two of the defendant's attorneys who were representing him as defense counsel in a tort case were also working part-time as assistant county prosecutors for the same office that was prosecuting the defendant for a related criminal matter. *Id.* at 949. The court held that because the defendant's civil defense attorneys "were employed by the prosecutor throughout the period this case was pending trial, their actions and the actions of their law firm disqualify the entire prosecuting attorney's office." *Id.* at 951. In *Ross,* members of the prosecuting attorney's office had access to privileged information from the defendant's civil defense attorneys who were also employed as prosecutors in the same office. Thus, because of the attorney-client relationship between the defendant and his civil attorneys, the part-time employment of the defendant's civil attorneys with the prosecuting attorney's office mandated their disqualification from the case.

Defendant next relies on *State v. Burns,* 322 S.W.2d 736 (Mo.1959). In *Burns,* the defendant hired an attorney to represent him in a criminal matter. *Id.* at 740. The defendant's attorney was then elected Prosecuting Attorney for the same office by which the defendant was being prosecuted. Thereafter, the defendant's attorney discontinued representation of the defendant and assumed his duties as the Prosecuting Attorney. *Id.* The court held that "the very fact that he [Prosecuting Attorney] had acquired that [privileged] information *as counsel for the defendant,* and that he might use it, renders his subsequent position [as Prosecuting At-

ary 4, 1993, consultation with Mr. Wampler, when Defendant and his parents were in his office, that Defendant allegedly made a statement to Mr. Wampler that, "I shot my grandfather twice."

**4.** Defendant maintains that he did raise an objection to this issue at trial. The extent of Defendant's reference to the disqualification of the special prosecutors was his statement that in the

event that the court found that privileged information was passed between Dee Wampler and the special prosecutors, "that presents another issue, apparently, whether these folks should still be on the case."

**5.** All rule references are to Missouri Court Rules (1997), unless otherwise specified.

torney] wholly untenable." *Id.* at 741 (emphasis added).

The facts in the instant matter are incongruous with *Ross* and *Burns.* The State's special prosecutors in the case at bar were not previously employed by Defendant, nor were the special prosecutors in any manner affiliated with Defendant's defense counsel.

Here, there were no former or existing relationships between the special prosecutors and Defendant which could have created a conflict of interest with respect to the special prosecutors' representation of the State of Missouri.

We note, in fact, that Mr. Wampler did *not* testify during the trial of Defendant. Following an evidentiary hearing conducted by the trial court in chambers, the special prosecutors for the State related to the trial court and defense counsel that "[i]n light of the content of the alleged conversation on the 4th [of January, 1993], I think that I will not call him [Mr. Wampler]." Therefore, any privileged or work-product communications between Defendant and Mr. Wampler, as expressed from the witness stand by Mr. Wampler, were never placed before the jury, and thus had no impact on its verdict.

■ Appellate courts use the plain error rule sparingly and limit its application to those cases where there is a strong, clear demonstration of manifest injustice or miscarriage of justice. *State v. Varvera,* 897 S.W.2d 198, 201 (Mo.App.1995). We determine that the trial court did not abuse its discretion in failing to remove the special prosecutors from the case and appoint new special prosecutors, as allegedly requested by Defendant. *See McNeal,* 880 S.W.2d at 330. We find no clear demonstration by Defendant of either manifest injustice or a miscarriage of justice in his allegation of error. *See State v. Fleer,* 851 S.W.2d 582, 592 (Mo.App.1993). Point I is denied.

## II.

■ In his second point, Defendant premises trial court error in denying Defendant's motion to dismiss the information charging him with murder, as well as denying his motion in arrest of judgment and acquittal, and new trial. He more specifically bases his contention of error on the grounds of conflict of interest resulting from one of his former defense attorneys, Ms. Elizabeth Bock,[6] joining the Greene County Prosecutor's Office. Although the Greene County Prosecutor's office filed a motion seeking a disqualification of the entire office from participating in Defendant's prosecution on April 16, 1996, Defendant maintains that a number of pre-trial motions were heard by the trial court during the interim between the time Ms. Bock joined the Greene County Prosecutor's Office and the time the office disqualified itself from participation in Defendant's case. Therefore, Defendant argues, all of these pre-trial proceedings were tainted with impropriety because of the alleged conflict of interest resulting from Ms. Bock's activities as both Defendant's counsel and, later, a member of the prosecutor's office.

On September 3, 1996, prior to beginning the first day of trial, the trial court conducted a hearing in chambers on Defendant's motion to reconsider the court's rulings on all pre-trial motions made before the special prosecutors were appointed.

Following a hearing conducted by the trial court in chambers regarding various pre-trial motions and the rulings thereon, the trial court stated the following:

> [W]hen she [Elizabeth Bock] went to the prosecutor's office, she was never, never involved in this particular case, was in a different division.
>
> * * *
>
> [T]he Court felt—and I think even the prosecutors felt—that since she was a member of the prosecutor's office, that they ... brought it to the attention of defense, and defense had the option to say that's okay or not. And the defense didn't waive it [conflict of interest], so we ... appointed special prosecutor.... I'm go-

---

6. Ms. Bock had represented Defendant from November 1994 until February 1995, while she was employed with the public defender's office.

ing to show ... on reconsidering the rulings, the Court is going to show this motion [to reconsider previous rulings] is overruled.

We review the trial court's decision to overrule Defendant's motion to reconsider under an abuse of discretion standard. *See generally State v. Harris,* 939 S.W.2d 915, 919 (Mo.App.1996).

While theoretically the prosecuting attorney's office could have gained access to confidential information, there is no allegation that it did so. Rather, recognizing the potential for the disclosure of such information, the prosecuting attorney's office voluntarily withdrew after Defendant declined to waive the potential conflict. *See generally Harris,* 939 S.W.2d at 920.

A very strong showing is required to prove an abuse of trial court discretion. *State v. Wendleton,* 936 S.W.2d 120, 123 (Mo.App. 1996). Furthermore, Defendant has the burden of showing prejudice resulting from the denial of the motion. *Id.* Having carefully reviewed the record in this case, we found no abuse of trial court discretion with regard to the trial court's ruling denying Defendant's motion to reconsider and set aside its pretrial rulings on the basis of any conflict of interest as alleged by Defendant. Point II is denied.

### III.

In Defendant's third point, he contends that it was trial court error to deny him a new trial because the trial court allowed statements made by Defendant to Detective Thomas to be admitted in evidence that should have been suppressed. Defendant maintains that he did not receive the warnings required by Rule 122.05, relating to Rights of Juveniles, before he made incriminating statements to Detective Thomas.[7] Thus, he argues the trial court should have granted his motion to suppress such statements.[8] Defendant also maintains that the trial court's failure to issue specific findings

of fact and conclusions of law in overruling his motion to suppress was reversible error.

We note that in addition to filing a motion to suppress, Defendant timely objected to the admission of his statements during the trial to preserve Defendant's point for appellate review. *See Wendleton,* 936 S.W.2d at 122–23; *State v. Norton,* 904 S.W.2d 265, 271 (Mo.App.1995); *State v. Simon,* 680 S.W.2d 346, 349 (Mo.App.1984).

■ In reviewing a trial court's denial of a motion to suppress, we look only to determine whether the evidence was sufficient to support the ruling. *State v. Rushing,* 935 S.W.2d 30, 32 (Mo. banc 1996). The facts and reasonable inferences arising therefrom are to be stated favorably to the order challenged on appeal. *Id.* It is not this Court's province to substitute its discretion for that of the trial court. *Id.*

■ Rule 122.05, relating to Rights of Juveniles, states the following:

Prior to *in–custody* interrogation, the juvenile shall be advised by the juvenile officer or by a designee trained by the juvenile officer that he has the right to remain silent, that he has the right to an attorney and if he is unable to afford an attorney that one will be provided for him, that whatever he says to the juvenile officer or juvenile court personnel can be used in certain later proceedings, that if he does talk he has the right to stop talking at any time and that whatever he says to the police or others than the juvenile officer or juvenile court personnel *may be used against him in the event he is prosecuted as an adult.*

Rule 122.05 (emphasis added). Defendant argues his confession should have been suppressed because he did not receive each of the warnings contained in Rule 122.05. He particularly urges that he was not told that "what he said [to the police or others than the juvenile officer or juvenile court person-

---

7. All Rule 122.05 references are to Missouri Court Rules (1993).

8. We note that each of Defendant's four tape recorded statements to Detective Thomas were

admitted in evidence and were played for the jury during the trial; each member of the jury was also provided a copy of the transcript from each statement.

nel] could be used against him in an adult criminal proceeding."

However, prior to the beginning of each of Defendant's four interviews with Detective Thomas, Defendant was issued the following rights and warnings by Juvenile Officer Epperly: (1) you have the right to remain silent; (2) anything you say will be used against you in a court of law; (3) you have the right to talk to a lawyer and have him present with you while you are being questioned; (4) if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish; and (5) you can decide at any time to exercise these rights and not answer any questions or make any statements. Additionally, Juvenile Officer Epperly also warned Defendant that he would be questioned by a police officer "who is not acting as your friend, but as an adversary." *See State v. Wright,* 515 S.W.2d 421, 430–31 (Mo. banc 1974).

Juvenile Officer Epperly also asked Defendant and his parents if they understood each of the rights and warnings read to Defendant.[9] Defendant and his parents responded in the affirmative. The transcript from each interview conducted on January 3, 4, and 7, 1993, established that Defendant was informed of the same rights and was issued the same warnings before the beginning of each interview.[10]

The transcript from Defendant's interview on January 7, 1993, revealed that Defendant was given the following rights and warnings by Juvenile Officer Epperly, generally tracking Rule 122.05:

Q. Okay, Now, as I move on down the page here, Jeremaine, the offense which you are being questioned about would be a felony if committed by an adult and simply, what we want to question you about is the death of your grandfather, Samuel Duke. Uh, now, do you understand, this offense would be a felony if committed by an adult.

A. Yes.

Q. You need your initial's [sic]. Section 211.071 of the Missouri Revised Statutes provides that a person who is fourteen years of age or older, who has allegedly committed an offense which would be a felony if committed by an adult, may be transferred to an adult court. Do you understand that, Jeremaine?

A. Yes.

Q. Now, we go to page here and uh, I would ask that, if you understand these, if you would indicate so by writing yes or no. Do you understand the offense we want to question you about would be a felony if committed by an adult?

A. Yes.

Q. Do you understand that since you are fourteen years of age or older, I understand that you are fifteen years of age, that you may be transferred by Juvenile Court to an adult court to be tried as an adult for this alleged offense. Do you understand that?

A. Yes.

Q. Moving down the page here, do you understand what I have just told you?

A. Yes.

Q. Okay. Do you want me to explain or repeat anything I have just told you?

A. No.

Additionally, the transcripts from the interviews conducted on January 3, 1993, and January 4, 1993, established that Defendant appeared with his mother and step-father and was informed of the same rights and was issued almost precisely the same warnings

---

**9.** Defendant was fifteen years of age at the time of the offense and during the time he was questioned by Detective Thomas. Therefore, he was a juvenile pursuant to section 211.021, which states that a "child" means a person under seventeen years of age. § 211.021(2).

We note that Defendant's parents were present during each of Defendant's first three interviews with Detective Thomas but were not present during Defendant's fourth interview. However, Defendant's attorney, Mr. Dee Wam-
pler, was present during Defendant's fourth interview with Detective Thomas.

**10.** We note that the Court's file did not contain a transcript from the interview conducted on January 2, 1993. However, the legal file contained a "Juvenile Rights Form," dated January 2, 1993, which contained the same rights and warnings as was given to Defendant in each of his following three interviews. Defendant's initials appear on a line preceding each individual right and warning.

[in compliance with Rule 122.05] before the beginning of each interview. Therefore, the fact that he was specifically advised that "anything you say will be used against you in a court of law," combined with the specific recitations that Defendant may be transferred by the Juvenile Court "to an adult court to be tried as an adult for this alleged offense" was in substantial compliance with the requirements of Rule 122.05, which provides: "[any statements made] may be used against him in the event he is prosecuted as an adult." Consequently, under the totality of the circumstances, it is clear that Defendant was fully aware that anything he said during each of his interviews could be used against him in an adult court proceeding. *See State v. Jones,* 699 S.W.2d 525, 528–29 (Mo.App.1985).

■ We further note that Rule 122.05 states that a juvenile suspect is entitled to the rights contained in the rule prior to *"in-custody* interrogation." Rule 122.05 (emphasis added). However, where a defendant voluntarily appears at the police station and voluntarily submits to questioning by police, a "custodial interrogation" does not exist.[11] *State v. Floyd,* 847 S.W.2d 97, 98 (Mo.App. 1992). "Custodial interrogation occurs only when the suspect is formally arrested or is subjected to arrest-like restraints." *State v. Matheson,* 919 S.W.2d 553, 556 (Mo.App. 1996). Further, there is no "custodial interrogation" when a suspect is questioned if he is not under arrest or otherwise restrained of his liberty. *Id.*

Here, Defendant did not make his statements during a custodial interrogation. Indeed, the record shows that Defendant and his parents requested the interviews and voluntarily submitted to questioning from Detective Thomas. Defendant was not placed under arrest nor was his liberty restrained during each of the first three interviews. After each such interview Defendant returned home.[12] There is no violation of Rule

122.05 nor any constitutional violation when voluntary statements are made to police in a noncustodial setting. *See State v. Isa,* 850 S.W.2d 876, 894 (Mo. banc 1993).

■ Finally, a trial court is not required to perform a precise recital of formal findings when it overrules a motion to suppress a confession. *State v. Wise,* 879 S.W.2d 494, 505 n. 2 (Mo. banc 1994), *cert. denied,* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995); *State v. Schnick,* 819 S.W.2d 330, 336 (Mo. banc 1991). Thus, in the instant matter, the trial court's failure to issue specific findings when it overruled Defendant's motion to suppress is not reversible error. *See id.* Point III is denied.

## IV.

■ In Defendant's fourth point, he maintains that it was trial court error to deny him a new trial on the basis that his motion to suppress his statements should have been granted because "the Defendant made the statements to a juvenile officer, rendering the statements inadmissible under ... § 211.271.3."

Section 211.271.3 states the following:

*After a child is taken into custody* as provided in section 211.131, all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel and all evidence given in cases under this chapter, as well as reports and records of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter.

§ 211.271.3 (emphasis added). We have already determined that Defendant was not taken into "custody" prior to any of his four interviews with Detective Thomas. *See* Part III., *supra.* Therefore, no violation of section 211.271.3 occurred when Defendant was interviewed by Detective Thomas.

---

11. Rule 110.05a(9) states that "judicial custody" means the taking or retention of custody of the person of a juvenile in either protective custody or detention. Rule 110.05a(6) states that "detention" means the *taking and retention* of the person of a juvenile in judicial custody. (emphasis added).

12. Defendant was taken into custody following his fourth interview wherein he confessed to Detective Doug Thomas that he had shot his grandfather and that it was not an accident.

■ Further, we note that the mere presence of a juvenile officer to warn a juvenile suspect of his rights and to make sure that such rights are accorded to him does not render a confession to a police officer a statement to the juvenile officer. *Wright,* 515 S.W.2d at 430; *see also State v. Thomas,* 698 S.W.2d 942, 946 (Mo.App.1985). Juvenile Officer Epperly was present during each of Defendant's four interviews with Detective Thomas. However, there is nothing in the record of this case to suggest that Juvenile Officer Epperly participated in any manner with Detective Thomas in questioning Defendant. The record established that Juvenile Officer Epperly's presence during Defendant's interviews was only to advise Defendant of his constitutional and statutory rights. Defendant's assertions to the contrary are without merit. Point IV is denied.

## V.

■ In Defendant's fifth point, he assigns error to the trial court in overruling Defendant's oral, pre-trial motion to exclude testimony from Dr. Richard Wetzel because Dr. Wetzel's examination of Defendant was made pursuant to an order issued by Judge McGuire during the pendency of a motion to disqualify Judge McGuire.[13] The motion to disqualify was made pursuant to Rule 32.09, Missouri Court Rules (1995), the "fundamental fairness" provision implicitly governing self-disqualification of judges. *See State v. Cooper,* 811 S.W.2d 786, 790–91 (Mo.App. 1991). Defendant asserts that Judge McGuire exceeded his jurisdiction when he ruled on the State's motion to have Defendant examined by Dr. Wetzel, while the motion to disqualify was pending. We disagree.

Initially, we note the immediate distinction between a motion to disqualify under the self-disqualification provisions of Rule 32.09, as opposed to Rule 32.07.[14] The latter provides that "[i]f the application is timely filed, the judge shall promptly sustain the application...." Rule 32.07(d). Whereas, Rule 32.09 speaks in terms of a judge disqualifying himself "when fundamental fairness so requires." Under Rule 32.09, "[a] judge's decision whether his or her own bias threatens the fundamental fairness of the proceedings is left to the court itself, and we will defer to that decision if there is no abuse of discretion." *Cooper,* 811 S.W.2d at 791.

We also note that the "criminal and civil change of judge systems are 'parallel' ... and, in many respects, the rules are virtually identical in language." *State ex rel. Mountjoy v. Bonacker,* 831 S.W.2d 241, 244 (Mo.App.1992).

In *In re Buford,* 577 S.W.2d 809 (Mo. banc 1979), the court held with regard to an application for change of judge that the rules require "that the party filing the application give notice to the other party *when it will be presented to the court.*" *Id.* at 833 (emphasis added). "[T]he matter should be called up before the judge for ruling." *Id.*

In the instant matter, Defendant had the responsibility of "calling up" the motion for ruling. *See id.* We note that the trial court's docket sheet reflects that Defendant's initial motion to disqualify was filed on July 26, 1994. However, there were no entries in the trial court's docket sheet reflecting that the motion was ever "called up" by either party. Defendant filed his amended motion to disqualify on June 7, 1995, eleven months after the initial motion. A hearing was then conducted on June 23, 1995, and Defendant's amended motion to disqualify was sustained.

Accordingly, pursuant to *In re Buford,* Judge McGuire had jurisdiction to enter an order requiring that Defendant be examined by Dr. Wetzel because the motion to disqualify had not been "called up" or otherwise presented for ruling. *See In re Buford,* 577 S.W.2d at 833; *see also Hall v. State,* 806 S.W.2d 429, 431 (Mo.App.1991)(holding that a "request for disqualification of judge is not self-executing").

---

**13.** Dr. Wetzel was not called as a witness during the State's case-in-chief. The State called Dr. Wetzel to testify at the close of Defendant's case-in-chief to rebut the testimonies of Dr. Clifford Whipple and Dr. Kenneth Burstin, who each testified on behalf of Defendant. Thus, in fact, Dr. Wetzel did not testify about his independent mental evaluation of Defendant, which was made pursuant to Judge McGuire's order.

**14.** *See* Rules 32.07 and 32.09, Missouri Court Rules (1995).

Furthermore, a "[d]efendant must preserve his claim for review by objecting at [the appropriate time during the] trial, not by making [a] pre-trial motion alone. *State v. Arnold*, 859 S.W.2d 280, 282 (Mo. App.1993); *see also State v. Copeland*, 928 S.W.2d 828, 848 (Mo. banc 1996), *cert. denied*, ― U.S. ―, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997). "Failure to object at the earliest opportunity to the admission of evidence constitutes a waiver of the contention." *State v. Wright*, 934 S.W.2d 575, 584, n. 7 (Mo.App.1996). Absent a specific objection during the trial, the contention is not preserved for appellate review. *Id.* Here, our search through the record revealed that Defendant failed to specifically object to Dr. Wetzel being allowed to testify in rebuttal. At most, Defendant attempted to limit the scope of Dr. Wetzel's rebuttal testimony. Therefore, notwithstanding our determination that Judge McGuire had jurisdiction to order Defendant's examination by Dr. Wetzel, Defendant's point was not preserved for appellate review. *State v. Bransford*, 920 S.W.2d at 944. Point V is denied.

## VI.

In Defendant's sixth point, he asserts that his constitutional rights to a speedy trial were violated because "a delay of over three and a half years occurred." [15]

Section 545.780 states "[i]f defendant announces that he is ready for trial and *files a request* for a speedy trial, then the court shall set the case for trial as soon as reasonably possible thereafter." § 545.780.1 (emphasis added).

During a pre-trial conference on the first day of trial, one of Defendant's attorneys stated to the trial court that "I would like to at least make an oral motion to dismiss based on the speedy trial act of the federal and state constitution, and submit it on the record with judicial notice." Further, defense counsel stated to the trial court that "[w]e have looked at the factors … [and] I don't

recall us ever demanding [a speedy trial]." Finally, Defense counsel admitted that, "in candor, the record will reflect a number of defense continuous [sic] motions, [and] we don't have any evidence to present with respect to prejudice at this time."

This Court searched through the record of this case but was unable to find any requests for a speedy trial made by Defendant pursuant to section 545.780.1. A formal request is required to assert the right to a speedy trial. *State v. Woodworth*, 941 S.W.2d 679, 694 (Mo.App.1997); *State v. Davis*, 903 S.W.2d 930, 936 (Mo.App.1995).[16]

In our *ex gratia* review of Defendant's point, we note that in deciding whether a defendant has been deprived of his speedy trial right, the Missouri Supreme Court adopted the method of analysis set forth by the United States Supreme Court. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972); *State v. Bolin*, 643 S.W.2d 806, 812–16 (Mo. banc 1983); *see also Davis*, 903 S.W.2d at 936; *Dillard v. State*, 931 S.W.2d 157, 162 (Mo. App.1996).

The first factor requires inquiry into the length of delay between the time the defendant became an accused and the time of trial. *Dillard*, 931 S.W.2d at 162. The length of the delay is to some extent a triggering mechanism. *Id.* Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into balance. *Id.* If the length of the delay is found to be presumptively prejudicial, then the court must also inquire into (1) the reason for the delay; (2) the accused's assertion of the right to a speedy trial; and (3) the prejudice to the accused cause by the delay. *Id.* The final factor regarding prejudice to the accused is most important. *Dillard*, 931 S.W.2d at 162.

A delay of over eight months is usually considered presumptively prejudicial,

---

15. *See United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Fleer*, 851 S.W.2d at 595.

16. In its objection to the State's request for a change of judge, Defendant stated that the

State's request would cause delay and therefore violate Defendant's right to a speedy trial. However, Defendant did not specifically request a speedy trial, nor did Defendant ask that he be brought to trial sooner.

at least in a case not involving unusually complex issues. *Id.* at 162.

In the instant matter, the delay in bringing Defendant to trial exceeded eight months.[17] The delay was therefore presumptively prejudicial, requiring consideration of the other three factors enumerated in *Dillard. See id.*

As to the first factor, we note that Defendant engaged in a vigorous defense, involving the filing of numerous motions, many of which were subsequently amended during the litigation process. Among them were, *inter alia,* motions for discovery, notice of intent to rely on the defense of mental disease or defect (requiring a psychiatric evaluation), objections to the State's request for change of judge, several pre-trial motions to suppress physical evidence and statements of the Defendant previously made, a motion for a psychiatric evaluation of the Defendant's own choosing, and a motion for inmate transportation to the psychiatric exam. Also, Defendant filed numerous motions to dismiss and filed more than one motion for continuance. Defendant also changed counsel more than once and filed one Rule 32.07 motion for change of judge and two motions seeking the trial judge's recusal from the case.

Where the defendant contributes to the delay by asking for and being granted a continuance, change of judge, and requests are made and granted for mental examinations, those reasons for delay are weighed heavily against him. *State v. Farris,* 877 S.W.2d 657, 660 (Mo.App.1994)(finding no violation of right to a speedy trial in a delay of three years and two months).

While recognizing that the State also engaged in a vigorous prosecution with its attendant motions, together with its applications for change of judge, nothing in the record indicates that the State deliberately attempted to hamper the defense.

With regard to the second factor regarding asserting the right to a speedy trial, Defen-

dant admitted that he failed to formally request a speedy trial. *See* discussion, *supra.*

■ The third factor requires Defendant to establish prejudice as a result of the delay. *See Dillard,* 931 S.W.2d at 162. "Any prejudice complained of must be actual, apparent on the record or by reasonable inference, 'not speculative or possible prejudice.' " *Farris,* 877 S.W.2d at 663. Further, "[t]he failure to present evidence of actual prejudice weighs heavily in favor of the government." *Id.* (quoting *United States v. Baker,* 10 F.3d 1374, 1401 (9th Cir.1993)).

Defendant argues that the delay in beginning the trial prejudiced him because he aged three years and his personality changed during that time. Defendant's evidence of prejudice is "speculative," at best. *See id.* at 663. This Court is not persuaded that Defendant suffered any prejudice as a result of the delay. *See id.* at 663–64. Point VI is denied.

## VII.

In Defendant's seventh point, he maintains that the juvenile court judge abused his discretion and was not an impartial arbitrator when he dismissed the juvenile petitions and certified him as an adult for the purpose of trial. It was, therefore, trial court error to deny his third amended motion to dismiss his murder charge and his motion for new trial.

■ "Appellate review of a juvenile court's decision to terminate jurisdiction as to a youthful offender is limited to a determination of whether in the totality of the circumstances the court abused its discretion." *Woodworth,* 941 S.W.2d at 697; *see also State v. Simpson,* 836 S.W.2d 75, 81 (Mo. App.1992). Section 211.071 governs the dismissal of juvenile proceedings to allow prosecution under the general law.[18] That section listed eight non-exclusive factors to be considered by the juvenile court in determining

---

**17.** Defendant was involved in the Juvenile Court system for approximately one year prior to a felony complaint being filed against him under the general law.

**18.** We note that section 211.071 was amended in 1995, and the factors enumerated under subsec-

tion six have been expanded from eight to ten. *See* § 211.071.6, RSMo Cum.Supp.1996. However, Defendant's certification process proceeded under the former version of the statute which we quote herein. *See* § 211.071.6, RSMo 1994.

whether the child is a proper candidate for adjudication within the juvenile court system:

(1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;

(2) Whether the alleged offense involved viciousness, force and violence;

(3) Whether the offense alleged was against persons or property . . . ;

(4) Whether the offense alleged is part of a repetitive pattern of offenses . . . ;

(5) The record and history of the child . . . ;

(6) The sophistication and maturity of the child . . . ;

(7) The program and facilities available to the juvenile court in considering disposition; and

(8) Whether the child can benefit from the treatment or rehabilitative programs available to the juvenile court.

§ 211.071.6. The certifying court need not give equal weight to each of the listed factors, nor is it required to make an express finding on each one. *Woodworth,* 941 S.W.2d at 697. Further, it was the juvenile court's function to weigh all the evidence, both which tended to support relinquishment of jurisdiction and that which tended to support retention of jurisdiction. *See State v. Garbe,* 740 S.W.2d 266, 268 (Mo.App.1987). Appellate courts will not weigh the evidence nor determine the reliability or credibility of witnesses. *State v. Fyfe,* 922 S.W.2d 71, 74 (Mo.App.1996).

 Here, following the juvenile court's hearing to determine whether Defendant would be prosecuted under the general law, the juvenile court judge expressly made the following findings as to the allegations against Defendant:

a. The alleged offense [murder in the first degree] if found to be true, is serious;

b. The alleged offense, if found to be true, is a crime against a person which resulted in the death of that person from being shot in the head twice;

c. The alleged offense, if found to be true, involved viciousness, force, and violence

[the weapon was fired at the head of Defendant's grandfather, at close range];

d. The Defendant had prior contacts with law enforcement for the commission of a felony and misdemeanor offenses, and that Defendant does not intend to adjust to the non-criminal requirements of society;

e. That Defendant posed a threat to the community and no suitable facility existed for Defendant which could have afforded the community protection from Defendant [the Division of Youth Services testified that it did not provide any program that would be appropriate for a juvenile alleged to have committed a homicide. Presupposing Defendant was able to pay for and allowed into a private facility, such as Ozanam Home, and permitted to stay beyond the age of 18 to the age of 21, the facility would only provide six years of treatment, at most];

f. The likelihood of rehabilitation of Defendant would not be substantially increased by the juvenile court's retention of Juvenile Court Jurisdiction;

g. The Juvenile Division of the Greene County Circuit Court did not have any suitable facility which could be utilized for a treatment program for Defendant;

* * *

l. The best interests of Defendant would be served by dismissing the Petition in Juvenile Court and allowing Defendant to be prosecuted under the general law; and

m. Under the totality of the circumstances, Defendant should be prosecuted under the general law.

Given these findings, juxtaposed with the factors enumerated within section 211.071, *supra,* this Court is unable to say that there was any abuse of juvenile court discretion in deciding to relinquish juvenile court jurisdiction and to permit Defendant to be prosecuted under the general law. *See Woodworth,* 941 S.W.2d at 697.

 Defendant also complains that the juvenile court judge was not an "impar-

tial arbitrator." [19] "It is presumed that judges act with honesty and integrity and will not undertake to preside in a trial in which they cannot be impartial." *State v. Kinder*, 942 S.W.2d 313, 321 (Mo. banc 1996) (citation omitted). In the argument portion of Defendant's brief, he failed to identify any statement or ruling made by the juvenile court judge during the course of the hearing that bears any hint of bias. *See id.* at 322. The juvenile court judge made no statements on the record or in his ruling that could be reasonably perceived as a threat to ignore the law or that could be reasonably perceived as a threat to his impartiality. *See id.; see also State v. Dodd*, 944 S.W.2d 584, 586–87 (Mo.App.1997). Point VII is denied.

## VIII.

■ In Defendant's eight point, he maintains that the trial court erred in submitting the State's definition of "reasonable doubt" to the jury in the State's Instruction Number 4. Defendant maintains that term "firmly convinced," as used in the State's reasonable doubt instruction, does not meet constitutional guidelines. The State's Instruction Number 4 was patterned from MAI–CR 3d 302.04. Defendant's claim is wholly without merit. *Woodworth*, 941 S.W.2d at 700; *see also State v. Chambers*, 891 S.W.2d 93, 105 (Mo. banc 1994) ("[t]his claim is again rejected"); *Wright*, 934 S.W.2d at 585. Point denied.

## IX.

■ In Defendant's ninth point, he maintains that Greene County Prosecutor Thomas E. Mountjoy gained privileged and confidential information from Juvenile Officer Epperly regarding Dr. Clifford Whipple's mental examination. Defendant avers that the communications between Mr. Mountjoy and Juvenile Officer Epperly were in violation of section 211.071.5, constituted prosecutorial misconduct and was therefore violative of his State and United States constitutional rights, previously set out. Consequently, Defendant maintains that the trial court erred in denying his motion to dismiss the murder charge against him.

Section 211.071.5 states the following:

The juvenile officer *may consult* with the office of prosecuting attorney concerning any offense for which the child could be certified as an adult under this section. *The prosecuting attorney* shall not divulge any information regarding the child and the offense until the juvenile court at a judicial hearing has determined that the child is not a proper subject to be dealt with under the provisions of this chapter.

§ 211.071.5 (emphasis added).

Defendant argues that although section 211.071.5 permits a juvenile officer to consult with the prosecuting attorney regarding an offense alleged to have been committed by a child, "it certainly gives no authority for the prosecutor to receive privileged and confidential information concerning the juvenile's mental condition and concerning statements made of the juvenile to a mental health professional...."

■ We note that neither party cites any cases directly on point. However, in construing a statute, the courts consider words used in the statute in their plain and ordinary meaning, which is found in the dictionary. *City of Dellwood v. Twyford*, 912 S.W.2d 58, 60 (Mo. banc 1995). "Consult" is defined as: "to deliberate, counsel, to ask the advice or opinion of, ... to deliberate together, confer." WEBSTER'S NEW COLLEGIATE DICTIO-

---

**19.** During the April 5, 1996, hearing on Defendant's motion to reconsider the trial court's previous denial of Defendant's motion to dismiss, Defendant alleged that Juvenile Court Judge Thomas McGuire made certain derogatory statements regarding African–Americans while the petition to certify Defendant as an adult was pending. Judge McGuire's former bailiff, Paul Hungerford, testified that Judge McGuire made some derogatory comments regarding African–Americans while in his chambers. Mr. Hungerford also admitted that he had had a disagreement with Judge McGuire over a job availability. In Judge McGuire's deposition, taken before the hearing on Defendant's motion to reconsider and admitted in evidence during the hearing, he denied ever having made the comments alleged by Judge McGuire's former bailiff. We note that appellate courts afford much deference to the trial court's superior opportunity to determine credibility of witnesses during pre-trial proceedings. *State v. Murdock*, 928 S.W.2d 374, 378–79 (Mo.App.1996).

NARY 244 (1977). Section 211.071.5 expressly authorizes consultations between juvenile officers and prosecuting attorneys regarding any offense for which the child could be certified as an adult.

The sole admonishment of Section 211.071.5 relates to prohibiting a *prosecuting attorney* from divulging any information until the child is certified as an adult. However, the statute does not purport to limit the scope of consultations between juvenile officers and prosecuting attorneys.[20] Point IX is denied.

## X.

In Defendant's tenth point, he maintains that his trial was barred by the double jeopardy clause and that therefore it was trial court error to deny his motion to dismiss and his motion for new trial. *See* U.S. CONST. amends. V, XIV; Mo. CONST. art. 1, § 19. Defendant argues that because the juvenile court heard substantive evidence regarding Defendant's guilt or innocence during his certification hearing that subjecting him to a trial under the general law was a violation of his rights against double jeopardy.

The argument Defendant postulates was rejected in *Carter v. Murphy*, 465 S.W.2d 28 (Mo.App.1971). The court in *Carter* very eloquently stated the following:

> Counsel [for Defendant] reaches his contention that his client is in double jeopardy on the theory that the two hearings constituted separate trials. The error of the conclusion rests upon an error in the premise. There was but one proceeding before the court which presented two questions. First, the court was required to determine the status of [Defendant] and second, whether or not [Defendant] should

be dealt with as a juvenile or certified for trial under the general law.

*Id.* at 32.[21]

Moreover, "[c]ourts have recognized that jeopardy does not attach unless a question of the defendant's guilt or innocence is involved, [and][w]ithout risk of determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy." *State v. Bibb*, 922 S.W.2d 798, 801 (Mo.App.1996) (citing *Serfass v. United States*, 420 U.S. 377, 388, 95 S.Ct. 1055, 1062, 43 L.Ed.2d 265 (1975)).

The purpose of Defendant's certification hearing was not to determine his guilt or innocence. Rather, its purpose was to determine whether Defendant would be tried in the juvenile court system or under the general law as an adult. *See* § 211.071; *Carter*, 465 S.W.2d at 32. Therefore, Defendant's certification hearing followed by a trial under the general law did not violate double jeopardy principles. *See id.*

Defendant's reliance on *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) is misplaced. In *Breed*, the Supreme Court expressly held that so long as a juvenile "transfer hearing" is conducted prior to an "adjudicatory hearing" under the general law, then double jeopardy principles are not desecrated. *Id.* at 536–38, 95 S.Ct. at 1789–90.

With regard to evidence being presented during the certification hearing regarding a juvenile defendant's guilt or innocence, we note that the Supreme Court stated that its holding in *Breed* did not prohibit the "States from requiring, as a prerequisite to the transfer of a juvenile, substantial evidence that he committed the offense charged, so long as the showing required is not made in an adjudicatory proceeding." *Id.* at 538 n. 18, 95 S.Ct. at 1790 n. 18. Point X is denied.

**20.** Section 211.071.5 was amended in 1995. The statute now expressly authorizes the prosecuting attorney to have access to police reports, reports of the juvenile or deputy juvenile officer, statements of witnesses and all other records or reports relating to the offense alleged to have been committed by the child. *See* § 211.071.5, RSMo Cum.Supp.1996.

**21.** This Court notes that counsel for both the Defendant and State neglected to cite, or ignored, the decision in *Carter v. Murphy*, 465 S.W.2d 28 (Mo.App.1971).

## XI.

In Defendant's eleventh point, he maintains that the trial court erred in denying his motion to dismiss the information charging him with murder and in denying his motion for a new trial. Defendant argues that he was entitled to a new trial because Missouri's Juvenile Court system is "fatally flawed" because it violates the separation of powers clause of the Missouri Constitution and because it creates a "conflict of interest." [22]

Defendant asserts that because the juvenile officer is appointed by the juvenile court judge, the certification procedure creates a conflict of interest and violates the separation of powers clause. Defendant relies on *In re F C*, 484 S.W.2d 21 (Mo.App.1972). The court in *In re F C* held that the functions of a juvenile officer and a prosecuting attorney are so inherently conflicting that the proper administration of the Juvenile Act does not allow these functions to be exercised by an individual holding both offices. *Id.* at 25.

We have no quarrel with the holding in *In re F C* Here, however, the record does not suggest that the functions of juvenile officer and prosecuting attorney were exercised by the same individual. The record equally does not support the existence of any conflict of interest.

With the exception of Defendant's misplaced reliance on *In re F C* Defendant failed to develop his argument or to cite to any authority, outside the constitutional provisions themselves, to support his argument that Missouri's Juvenile Court system is "fatally flawed." *See Woodworth,* 941 S.W.2d at 697. "Where a party fails to support a contention with *relevant* authority or argument beyond *conclusions,* the point is considered abandoned." *Id.* (emphasis added) (citations omitted). Point XI is denied.

## XII.

In Defendant's twelfth and final point, he contends that his conviction should be reversed and remanded for a new trial because of the cumulative effect that the errors committed by the trial court had on his trial. In directing this Court to the alleged cumulation of errors, Defendant merely refers the Court back to the arguments made in his previous points of error.

Our supreme court has rejected such a "cumulative error" theory, stating that "[n]umerous non-errors cannot add up to error." *State v. Gray,* 887 S.W.2d 369, 390 (Mo. banc 1994), *cert. denied,* 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995). Having determined that none of Defendant's previous points amount to reversible error, it follows that there can be no reversible error attributable to their cumulative effect. *See id.; see also State v. Williams,* 861 S.W.2d 670, 680 (Mo.App.1993). Point XII is denied.

The judgment is affirmed.

PARRISH, P.J., and SHRUM, J., concur.

---

**22.** Defendant cites to Mo. Const., art. I, §§ 1, 10 & 18(a).